2016 IL App (2d) 130703
No. 2-13-0703
Opinion filed January 6, 2016

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) | Appeal from the Circuit Court of Lake County. |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | No. 11-CF-1933 |
| | ) | |
| NSONI MPULAMASAKA, | ) ) | Honorable Daniel B. Shanes, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE BIRKETT delivered the judgment of the court, with opinion.
Justice Hutchinson concurred in the judgment and opinion.
Justice Burke specially concurred in part and dissented in part, with opinion.

**OPINION**

¶ 1   Following a jury trial, defendant, Nsoni Mpulamasaka, was convicted of aggravated criminal sexual assault in violation of section 12-14(a)(2) of the Criminal Code of 1961 (720 ILCS 5/12-14(a)(2) (West 2010)).  The trial court denied defendant's motion for judgment notwithstanding the verdict or a new trial.  Subsequently, defendant was sentenced to 12 years in the Illinois Department of Corrections.  On appeal, defendant argues that:  (1) he was not proven guilty beyond a reasonable doubt, because the State failed to prove force and failed to disprove his defense of consent by the victim; (2) the State committed prosecutorial misconduct during

closing argument; and (3) his 12-year sentence was excessive. For the following reasons, we reverse.

¶ 2                                I. BACKGROUND

¶ 3    In the early morning hours of June 16, 2011, defendant was involved in a sexual encounter with S.B. inside of S.B.'s parked vehicle, which was in the lot of a Denny's restaurant in Highland Park, Illinois. Defendant was arrested later that day and charged by complaint with criminal sexual assault. In the complaint, the State alleged that defendant committed an act of sexual penetration (penis in vagina) with S.B. by the use of force. 720 ILCS 5/12-13(a)(1) (West 2010). On July 6, 2011, a grand jury returned an indictment alleging in count I that defendant committed the offense of aggravated criminal sexual assault in that, while committing the offense of criminal sexual assault by the use of force, defendant caused injury to S.B. 720 ILCS 5/12-14(a)(2) (West 2010). Count II of the indictment alleged criminal sexual assault by the use of force. 720 ILCS 5/12-13(a)(1) (West 2010).

¶ 4    On August 2, 2011, defense counsel informed the trial court that he had not received still photographs and video taken inside the Denny's restaurant, which he asserted were exculpatory. On August 24, 2011, the grand jury added another count to the indictment. Count III alleged that defendant committed criminal sexual assault against S.B. in that he knew that she was "unable to give knowing consent." 720 ILCS 5/12-13(a)(2) (West 2010).

¶ 5    On November 23, 2011, defense counsel informed the court that the State had not produced any expert reports or evaluations regarding the allegation in count III that S.B. was unable to give knowing consent. In response, the State said that it had tendered discovery regarding S.B.'s intellectual disability. The trial was then delayed for a variety of reasons. On November 19, 2012, the State, now represented by two assistant State's Attorneys (ASAs) who

were new to the case, requested a continuance to determine whether it would retain an expert to evaluate S.B. Defense counsel stated, "[w]e have said since the beginning that *** it was consensual." On November 30, 2012, the State informed the court that it was not going to have an expert evaluate S.B.

¶ 6    The case proceeded to trial on January 28, 2013. Prior to trial, the State moved *in limine* to permit Dr. Linda Holt, S.B.'s treating physician, to testify to her opinion that the injury S.B. suffered to her vagina during intercourse with defendant was the result of a "forced rape." Defense counsel argued that such an opinion should not be permitted, because such an injury was also consistent with consensual sex. Defense counsel conceded that the physician should be allowed to testify that the injury was the result of blunt force trauma, but not that it was from "forced rape" or "sexual assault." The trial court took the motion under advisement.

¶ 7    At trial, S.B.'s mother, Margie B., testified that S.B. attended special education classes throughout grade school, high school, and college. After attending two years of college at National Lewis University, S.B. worked at a Gap clothing store for 15 years. S.B. owned a black Honda CRV, which Margie bought for her.

¶ 8    Margie testified that in June 2011 S.B. lived in Evanston with S.B.'s husband. On Wednesday, June 15, 2011, S.B. visited Margie at her home in Highland Park. S.B. left Margie's home about 8 p.m. to go to The Lantern, a bar in Lake Forest, to sing karaoke and hang out with her friends. Around 5:30 a.m. the next morning, Margie received a phone call from Evanston Hospital informing her that S.B. had been hurt. Margie drove to the hospital and saw S.B. in the emergency room, where S.B. was "crying heavily."

¶ 9    At the time of trial, S.B. was working at a Garden Fresh Market and was living with Margie and her husband. On cross-examination, Margie testified that the Highland Park police

station is a couple of minutes from the Denny's restaurant and that the Highland Park hospital is closer to the Denny's than the police station is.

¶ 10    S.B. testified that she was 41 years old and was divorced from her ex-husband after 10 years of marriage.  On the night of June 15, 2011, S.B. ate dinner at her mother's house and then drove to The Lantern to sing karaoke and hang out with her friends Julie Olnas, Beth Ann Groce, Shawn McFarland, Pete Singleton, and Olga Tychina.  S.B. met defendant for the first time at The Lantern that evening.  Although she usually drank alcohol with her friends at The Lantern, that night she drank only water.  When the karaoke ended at 1 a.m., S.B. drove to the Denny's to meet with "Beth, Julie, Jasmine and Boogie."  She parked her car in the Denny's parking lot. When S.B. arrived, Julie, Beth, and Jasmine were already at the restaurant.  The group went inside and sat down at a table.  S.B. identified the State's exhibit 30, a photograph that showed the group eating breakfast while seated at a table.  Defendant is seated next to S.B.

¶ 11    S.B. said that, after eating, she paid for her meal and went to the parking lot, where she saw her friends going to their cars.  S.B. went to her car and got in on the driver's side. Defendant got into the front passenger seat.  Then, S.B. testified:

> "Q.  And at some point, you ended up in the back seat?
>
> A.  Yes.
>
> Q.  Can you explain how that happened?
>
> A.  He flung my legs into the back seat.
>
> Q.  So from the front seat, your legs, you said your legs were flung back?
>
> A.  Yes.
>
> Q.  And then where did you end up?
>
> A.  On the passenger side."

¶ 12    S.B. identified a photograph of the backseat of her car. Once in the backseat, S.B. testified, she was thinking, "[w]hy am I back here in the back of my car?" S.B. said that defendant got into the backseat on the driver's side; she explained that she must have left the door unlocked. She then testified as follows:

> "Q.  And once he was in the back of the car and you were in the back of the car, what if anything did he do to you?
>
> A.  He took his penis and stuck it inside of me.
>
> Q.  Did you want him to do this?
>
> A.  No, I did not.
>
> Q.  And did you tell him you didn't want him to do this?
>
> A.  Yes.
>
> Q.  And what did you say to him?
>
> A.  I told him to get off me but he wouldn't get off me.
>
> Q.  Did you tell him anything else other than you wanted him off you?
>
> A.  No.
>
> Q.  How many times did you tell him this?
>
> A.  I told him three times but he wouldn't get off of me."

¶ 13    S.B. explained that she used her hands to try to get defendant off of her but he would not get off of her. She testified that when she said "inside me" she meant he put his penis in her vagina. At some point defendant stopped, and that was when she saw blood on defendant's penis. Defendant used his shirt to wipe the blood off and then exited the car. Before leaving, defendant said, "[d]on't tell anybody." After defendant left, she drove to her mother's house in Highland Park, which was her usual routine on Wednesdays. Once she arrived home she went to

bed. Her mother and father were home sleeping but she did not wake them. S.B. said, "I didn't want to upset my mother." She tried to get to sleep but could not do so, because her vagina was hurting. She noticed blood coming out of her vagina. She then drove herself to Evanston Hospital. On the way to the hospital, she stopped at the Winnetka police department but it was closed. Once at the hospital S.B. was admitted. Her clothes were taken and she signed a consent form for an operation. After undergoing surgery, S.B. spoke to a police officer about what happened. S.B. identified various exhibits, including a photograph of defendant and her at Denny's as well as the pants and underwear that she was wearing the night of the encounter with defendant.

¶ 14 On cross-examination, S.B. said she grew up in Highland Park and knew where the Highland Park police station was located but she did not go there on the night in question. Over the State's objection, S.B. admitted that when she got to Evanston Hospital she told hospital personnel that she had "spontaneously bled." In addition to signing the consent form for an operation, S.B. also signed a consent form for a transfusion. S.B. was then asked:

> "Q. You kissed Nsoni, did you not?
>
> A. Yes—yeah, I might have, but—yes.
>
> Q. And he kissed you?
>
> A. Yes."

¶ 15 S.B. said that she and defendant sat next to each other throughout the meal at Denny's. She was then asked:

> "Q. I know this is embarrassing, but you guys were holding hands under the table, weren't you?
>
> A. Yes.

Q. And at some point—I don't like doing this any more than I like asking—but at some point, you directed his hand to your thigh?

A. Yes.

Q. And after the meal, Nsoni actually paid for your breakfast, didn't he?

A. Yes."

¶ 16 S.B. admitted that her earlier testimony that she paid for her meal was inaccurate. She then identified a series of photographs that had been taken at The Lantern and at Denny's by a member of the group. S.B. said that the photographs showed the group having fun. She also identified defendant's exhibit number 27, a photograph of her standing next to defendant near the exit at Denny's. In the photograph, S.B. is wearing a black jacket and black pants. Her purse is strapped over her right forearm and she is holding a set of keys. S.B. is wearing hoop earrings, she has rings on both ring fingers, her fingernails are polished, and she is smiling. Defendant is standing to S.B.'s left, his head is tilted down, and he appears to be entering data into his cell phone. That photograph was taken after the meal was paid for, as they were about to go out to their cars. On cross-examination, S.B. provided additional details regarding the sexual encounter with defendant:

"Q. When you were in the back of your Honda CRV—

A. Yes.

Q. —with Nsoni—

A. Yes.

Q. —Nsoni laid on top of you, isn't that true?

A. Yes.

Q. And you said that was uncomfortable?

A. Yes.

Q. And so he got off?

A. Yes.

Q. And you repositioned, isn't that right?

A. Yes.

Q. And you said that's uncomfortable, too?

A. Yes.

Q. Then, he sat in the back seat and you straddled him, isn't that true?

A. Yes.

Q. When you straddled him, you were face to face with him?

A. Yes.

Q. And you had no pants on?

A. No—I mean, yes. I'm sorry, yes, I didn't have no pants on.

MR. STONE [(defense counsel)]: I'm sorry. The question had a negative. This was my fault, not yours.

THE COURT: You want to re-clarify.

MR. STONE: Sure.

Q. You sat on Nsoni without pants on?

A. Yes.

Q. Facing him?

A. Yes.

Q. And as you sat on him, his penis inserted into your vagina?

A. Yes.

Q. And at this point, you said that you felt some pain?

A. Yes.

Q. And you stopped?

A. Yes.

Q. And when he withdrew his penis, you noticed that there was blood?

A. Yes.

Q. And then the two of you got out of the car, didn't you?

A. Yes.

Q. Then he gathered up his belongings?

A. Yes.

Q. And, in fact, he dropped either his cell phone case—cell phone or his cell phone case, do you remember that?

A. I think so, yes.

Q. And you picked it up for him?

A. Yes.

Q. And you gave it to him?

A. Yes.

Q. And he hugged you?

A. Yes.

Q. And then he left?

A. Yes.

Q. And then you got in the car and drove home?

A. Yes.

Q. All the time thinking that you were married?

A. Yes.

MS. KALCHEIM-ROTHENBERG [(ASA)]: Objection.

THE COURT: Overruled.

Q. He was a stranger?

A. Yes.

Q. You really didn't know him?

A. No.

Q. He [*sic*] it was embarrassing?

A. Yes."

¶ 17 On redirect examination, the State did not question S.B. regarding the details she had provided on cross-examination that contradicted her direct examination. Instead, the State established that S.B. answered yes to most of defense counsel's questions. S.B. explained that she did not go to the Highland Park police station because "[m]aybe [she] was not thinking clearly enough." She did not know why she went to Evanston Hospital instead of Highland Park Hospital. She also said that she recently started going back to karaoke night. The State then sought to establish that S.B. could not distinguish photographs taken a week before the trial from those taken the night of her encounter with defendant. Defense counsel objected, noting that the photographs the defense used were tendered in discovery by the State and were represented to have been taken the night at issue by S.B.'s friend Olga. Finally, the State asked:

"Q. Mr. Stone asked you and talked to you about straddling the defendant. Do you know what the word 'straddle' means? When [*sic*] does it mean?

A. It means that my legs were wrapped around him.

> Q. Okay. And were you on the bottom and seated in the car?
>
> A. Yes."

On recross-examination, defense counsel clarified with S.B. that the people depicted in the photographs were the people she was with on June 16, 2011. S.B. again said that she held hands with defendant and directed defendant's hand to her thigh under the table at Denny's.

¶ 18    At the conclusion of S.B.'s testimony, the jury was excused and the State then announced that it intended to call Highland Park police detective Sean Gallagher to impeach S.B. regarding "prior inconsistent statements." The trial court asked what testimony was inconsistent. ASA Mathews said, "[j]udge, in that (1) she told the officers she did not consent basically." The State said that S.B. had told Gallagher that throughout the meal defendant kept bothering her, yet on cross-examination she said that "[d]efendant put his hand on her leg or thigh." The State explained that S.B. told Gallagher that while they were leaving defendant asked S.B. if she wanted to go to a hotel and she said no. The State said that while in the hospital after her surgery S.B. told Gallagher "that the defendant raped me," which was "inconsistent with her testimony on cross to some extent." Finally, the State said that S.B. told Gallagher that she paid for her own meal. ASA Mathews argued that what S.B. told Gallagher was "inconsistent with her saying that on cross that she willingly got on the defendant's lap; that she willingly repositioned herself while they were, according to Mr. Stone's own theory, having consensual sex in the back of the car; that she was agreeable to all this. It impeaches pretty much all of what she's saying now on cross."

¶ 19    Defense counsel argued that the State could not use a prior consistent statement to rehabilitate a witness who had been successfully impeached. The trial court ruled that Gallagher's proposed testimony was "a pure consistent statement, nothing relevant to it other

than to bolster her testimony." The trial court noted that S.B.'s direct testimony was a summary without any surrounding detail and that on cross-examination "she testified in greater detail to what the clear inference is, consensual sexual encounter." ASA Mathews responded, "correct, judge." Ultimately, the court held that both sides had ample opportunity to examine the witness and that Gallagher's proposed testimony would violate the rule against prior consistent statements. However, the court said that it would allow the State to recall S.B. in order to confront her with her statement to Gallagher about defendant bothering her throughout the meal, which would lay a foundation for Gallagher's testimony on that narrow issue. After all of this, the State announced that it was not going to recall S.B.

¶ 20 Gallagher testified that he interviewed S.B. at Evanston Hospital. S.B. identified defendant in a photograph that had been taken at Denny's. Gallagher said that he and other officers went to defendant's home at around 4 p.m. on June 16. As defendant was entering his car, the officers stopped him and asked for his name, which he provided. Defendant was then arrested. After being told his *Miranda* rights (*Miranda v. Arizona*, 384 U.S. 436 (1966)), defendant agreed to answer questions. When asked if he was at The Lantern the previous evening, defendant said he was at a bar in Lake Forest but he could not remember its name. Defendant denied going to Denny's. He also denied meeting any girls the previous night, including a girl named S.B.

¶ 21 Before being questioned, defendant had asked Gallagher what this was all about. Gallagher told him they were investigating an incident at the Denny's restaurant. A search warrant was obtained for defendant's apartment, and S.B.'s car was examined for evidence.

¶ 22 Highland Park police officer Michael Solesky, an evidence technician, testified that he took photographs of S.B.'s vehicle and collected a sexual assault kit at Evanston Hospital.

Solesky took a photograph of S.B. at the hospital. Solesky took swabs of S.B.'s neck for DNA testing at a crime lab. Solesky also collected samples from the stains located on the rear seat of S.B.'s vehicle. Solesky collected pieces of evidence from defendant's apartment, including a man's underwear, a T-shirt, and a sock recovered from the dryer. Solesky took a DNA swab from defendant.

¶ 23    On cross-examination, Solesky testified that he examined S.B. and that he found no cuts, contusions, or bruises on S.B.'s face or head. Likewise, she had no bruising on her arms, back, torso, or hands. Over objection, Solesky said he saw nothing of evidentiary value on S.B.'s hands. Solesky said that he found "a small, sort of quarter sized round-ish bruise on one of S.B.'s legs." None of the photographs received in evidence depict the bruise.

¶ 24    Julie Olnas testified that she was part of the group who met at The Lantern for karaoke and then went to Denny's. Olnas met defendant for the first time that night. While she was getting ready to drive to Denny's, defendant asked, while pointing to Olnas's friends Pete and Shawn, "[d]o you mind if me and my boys come with you?" Olnas said that they could. Defendant then asked her how many women were going to be there and she told him four. Olnas described the seating arrangement of the group while they were at Denny's and identified a Denny's security camera video in a DVD format. Portions of the DVD were played for the jury. A camera labeled "coffee shop video" shows a view of the dining area. At 1:39 a.m. on June 16, 2011, the DVD shows S.B. walking away from the table and disappearing from view, followed by defendant. Three minutes later they returned. A camera labeled "cash register video" shows S.B. and defendant standing next to each other just before leaving the restaurant at 2:32 a.m. followed by a group of people. The scene captured in this portion of the video appears to be the same as defendant's exhibit 27. The Denny's security tape indicated that the restaurant remained

open until after 4 a.m. Olnas said that while the group was seated at the table there was a conversation about having sex in a movie theater. She said that everyone at the table participated in the conversation. However, while S.B. participated in the conversation, Olnas said, S.B.'s face looked as if the conversation "flew over her head." Olnas testified that S.B. said, "I don't get it" and defendant said, "I can't stand you for pretending that you don't understand." Olnas testified that before ordering food defendant asked S.B. what she was going to get and S.B. said, "[w]hy? Are you—why? Are you—are you paying for it?" Defendant responded, "[d]on't worry about it."

¶ 25    After leaving the restaurant and while standing by her car, defendant said to Olnas, "[d]on't let anybody ever tell you that you don't look good in that dress because you do." He also told her he would like to "holler at" her and asked for her phone number, which Olnas provided. The State asked how Olnas felt at the time and the defense objected. After a sidebar conference the objection was sustained. Olnas was later asked, "[w]hy did you give him your phone number?" The defense objection to this question was overruled. Olnas answered, "I, personally, felt very scared." The trial court interrupted and stated, "[n]o, that's not going to be allowed." The answer was stricken. The State persisted in again asking, "[d]o you know why you gave the defendant your phone number?" Defense counsel's objection was sustained.

¶ 26    On cross-examination, Olnas acknowledged that in a written statement to the police she wrote that defendant laughed when he told S.B. that he could not believe that S.B. was pretending that she did not understand the conversation about having sex in a theater. Defense counsel then said to Olnas, "I think you told us that you don't give everybody your phone number." In response, Olnas said, "I am not terrified all the time, but yes, I don't give everybody my phone number. I'm not in a situation where I am terrified to hand out my phone

number to people, so yes, you're right, I don't give it out all the time." On redirect examination, over defense counsel's objection, the State was allowed to again ask why Olnas gave defendant her phone number. The court allowed the question because the defense "went into it." Olnas said she was "blindsided, in the dark, in a parking lot, with somebody I [didn't] know, and I couldn't even think about giving a fake phone number." The State then asked Olnas if she needed a minute. The court told Olnas to "just take a minute." The defense declined to recross.

¶ 27 Beth Groce testified that she was a member of the group that went to The Lantern and to Denny's along with S.B. and defendant. Groce took several of the photographs that were admitted into evidence. Groce testified that she met defendant for the first time that night. While at Denny's, defendant was first seated next to Shawn, Pete, and Reggie, but then, after using the restroom, defendant sat next to S.B. for the rest of the evening. Groce testified that there was horseplay going on at the table and that they were intoxicated. Everyone was involved in the horseplay except for S.B.

¶ 28 Groce said that after leaving Denny's she got into her car and saw defendant standing on the driver's side of his vehicle. S.B. was in her car. Olnas was in the front passenger seat of Groce's car and Vince was in the backseat. Pete, Shawn, and Olga were in Shawn's car. Only defendant was outside of a vehicle. Over objection by defense counsel, Groce was permitted to testify that before everyone pulled out of the lot she "told them to drive safe and text [her] when they got home." When Groce left, defendant was still standing by his car and S.B. was in her car.

¶ 29 On cross-examination, Groce said that she was not aware of anything that prevented S.B. from driving away. Groce testified that defendant was about 20 feet away from S.B.'s car when

Groce left.  Groce acknowledged that she had said in her written statement to the police that S.B. might have "laughed or giggled" during the "flirting or horseplay" but she did not join in it.

¶ 30    Pete Singleton, another member of the group at The Lantern and Denny's, testified that he met defendant for the first time the night of June 15, 2011.  After leaving The Lantern, defendant asked if he could join the group at Denny's and they said yes.  Defendant drove himself to Denny's.  Singleton said that when they were at Denny's and before the meal was served he overheard defendant ask S.B. "if they could go out and like have some—go out and go somewhere alone together."  S.B. answered "no" to defendant's request and turned her head away.  Singleton heard defendant ask S.B. again to leave with him, and Singleton then told defendant to leave S.B. alone.  Defendant asked S.B. to leave about five times and S.B. said "no" each time.  Singleton did not see S.B. and defendant holding hands.  Over defense counsel's objection, Singleton testified that S.B. looked like she was completely ignoring defendant.  The last time Singleton saw defendant was when defendant was talking to Olnas in the parking lot.  On cross-examination, Singleton acknowledged that he could not see what was happening underneath the table.

¶ 31    Shawn McFarland testified that he was a member of the group at The Lantern and Denny's.  He described S.B. as "kind-hearted" and "welcoming."  McFarland met defendant for the first time at The Lantern.  Upon leaving Denny's, McFarland saw defendant, S.B., and Olnas having a conversation in the parking lot.  As he drove away he saw S.B. by her car but did not see defendant.  On cross-examination, McFarland acknowledged that in a written statement to police he said defendant "continued to appear gentlemanly and cordial."  On re-direct the State, over an objection, elicited that in that same written statement McFarland wrote, "his initial candor did not sit well with me and I kept him at a distance."

¶ 32    After McFarland's testimony, the State sought a ruling on Dr. Holt's proposed testimony that S.B.'s vaginal injury was the result of a "violent attack" and "forced rape" and "could not happen in consensual sex." Defense counsel objected that such an opinion could not be "to a reasonable degree of medical certainty." Defense counsel argued that such an opinion would constitute junk science and that the trial court had an obligation to make sure it "doesn't come to a jury disguised as medical science." Counsel also argued that the defense would offer expert testimony that the injury could have been the result of consensual sex and that the expert had literature to support that opinion. The State said that Dr. Holt would testify as to the basis of her opinion. The trial court stated that absent foundation it would not admit expert testimony and that there was "no magic formula for what constitutes sufficient foundation from an opinion witness." The court ruled that it would also allow the defense expert, Dr. Brian Locker, to give his opinion subject to foundation and that he could comment on the literature.

¶ 33    Highland Park police officer John Loman testified that on June 16, 2011, he contacted defendant's wife, Larecia Baker, at her work to let her know that the police would be executing a search warrant at the apartment she shared with defendant. After executing the warrant, Loman told Baker to call him "if anything came up." Within an hour Baker called Loman. Loman returned to the apartment and recovered a towel and a toothpaste container that both had red stains on them.

¶ 34    Detective Sean Curran testified that he was present for the conversation between Gallagher and defendant, when defendant denied being at Denny's or meeting S.B. Curran testified that while defendant was detained at the Highland Park police station he was given takeout food from the nearby Denny's, which was routine. After receiving the food, defendant was seen throwing torn-up food containers from Denny's into the holding-cell toilet. Defendant

said something to the effect that he thought the police were trying to "frame him to get his fingerprints on materials from Denny's." On cross-examination, Curran acknowledged that upon being arrested defendant was told that the police were investigating an incident at Denny's.

¶ 35 Baker testified that on June 16, 2011, she and defendant had been married for two years. Her work schedule at the time was 3 p.m. until midnight and she was also attending school from 8 a.m. until 2 p.m. On June 16, she was called by the police and went to her apartment. Baker found the clothes defendant had been wearing the previous night in the washer and dryer. Defendant rarely did laundry and she had not washed the clothes, which were collected as evidence. She later called the police back to the apartment to retrieve the towel and tube of toothpaste because she thought they were suspicious.

¶ 36 On cross-examination, Baker explained that while she was working and in school defendant was in graduate school getting his master's degree and working. Their lives had "sort of drifted." The police told Baker that defendant was arrested for "having sex with a woman not his wife" and that she was extremely upset. At the time of trial, Baker and defendant were still together. Over defense counsel's objection, Baker was asked whether she told an officer that she felt that defendant had an inferiority complex with regard to his manhood. Baker answered that there were "a lot of things going on then, a lot of issues." On re-direct, Baker said she loved defendant.

¶ 37 Dr. Holt, a practicing obstetrician/gynecologist for 32 years, testified as an expert in the area of obstetrics and gynecology. Dr. Holt first saw S.B. on the morning of June 16, 2011, in the emergency room at Evanston Hospital. S.B. looked pale and very anxious. Dr. Holt had a discussion with S.B. about the risks and benefits of surgery. The emergency room had reported that S.B. had heavy bleeding that was clearly going to need suturing. S.B. consented to surgery

verbally and in writing. Before the surgery, Dr. Holt completed a sexual assault kit, but did not do a vaginal swab. Using a speculum, Dr. Holt was able to see the cervix and the top of the vagina. One of the lacerations was a linear one about four centimeters long and one centimeter deep in the vaginal wall. She observed that "the back wall of the vagina, underneath the cervix, which is the birth canal, was sort of bleeding tissue." That area was then sutured. Over objection, Dr. Holt testified that S.B. was given a transfusion of two units of blood during the procedure.

¶ 38    Dr. Holt described her experience in treating various types of vaginal injuries. She said that it is not uncommon to see women who have had a little bit of bleeding with intercourse, typically older women. Dr. Holt testified that she did not see vaginal trauma very often. In her 32 years she had treated a few dozen vaginal injuries. With regard to S.B.'s injuries, Dr. Holt testified that to a reasonable degree of medical certainty "you just don't see any injuries like that except in the case of some kind of traumatic event." Her opinion was based upon her education and experience. In general, when women are having sex, their vaginas become lubricated and stretch, which is why sexual injuries generally do not result from simple intercourse. Dr. Holt said she had seen these types of tears "from assaults and instrumentation a few times" but they were not common. Dr. Holt said, "I think the depth and the severity of the tearing, I just can't—I don't think—that could not occur in absence of violence of some sort." In her career she had not seen an injury like S.B.'s from consensual sex.

¶ 39    On cross-examination, Dr. Holt acknowledged that lubrication with women varies from individual to individual. She examined S.B.'s entire body and found no sign of violence to any other part of her body. S.B. did have a small bruise on her thigh that was "consistent with consensual sex." There was no injury to the vaginal opening, and the second laceration, near the

cervix, was about six or seven inches from the entrance of the vagina. Dr. Holt had no information regarding the size of defendant's penis. When defense counsel asked whether Dr. Holt saw or heard of any evidence of a weapon, the State objected, saying, "[s]he didn't review the police reports."

¶ 40    Dr. Holt acknowledged that when S.B. reported to the hospital she said that she had spontaneous bleeding that began about 1 a.m. Despite saying on direct examination that the injuries S.B. suffered could not have occurred without violence of some sort, Dr. Holt conceded that "[t]hese injuries could occur from consensual sex between a man and a woman."

¶ 41    On redirect examination, Dr. Holt testified that S.B. spoke to an emergency room physician, an intern, and a gynecology resident. S.B. also spoke "in some depth to a social worker, and, quickly, and then by the time the second interviewer was asking questions, she said 'yes, I was—that I was assaulted and that's when the bleeding started.' "

¶ 42    On recross-examination, Dr. Holt said she was not familiar with the Journal of the American Osteopathic Association. She acknowledged that there have been case reports of vaginal lacerations from intercourse that have been four centimeters long. Specifically, she said:

> "I am familiar that there are case reports, I already said that I think [*sic*] was possible, and I said yes, I thought that it's possible, but I'm also saying I've seen thousands and thousands of women that had consensual sex. So it's certainly not a very common—in fact, it's a case report that is so uncommon that gets published because it's so rare."

Dr. Holt acknowledged that she was not saying that "something couldn't happen" if she had not seen it.

¶ 43   Kelly Lawrence, a forensic scientist with the Northeastern Illinois Regional Crime Laboratory, testified that a presumptive test for saliva on swabs taken from the left and right neck area of S.B. was positive.   Also, DNA tests on these swabs matched defendant's DNA profile.  The red stain on the toothpaste tube matched S.B.'s DNA profile.  Swabs from the blood stains in S.B.'s car matched her DNA profile but were negative for the presence of seminal fluid.  Tests on the stains in S.B.'s underwear were also negative for the presence of seminal material.

¶ 44   The State rested, and defense counsel moved for a directed verdict.  Counsel began with count III, that defendant committed criminal sexual assault against S.B. in that he knew that she was "unable to give knowing consent."  720 ILCS 5/12-13(a)(2) (West 2010).  Defense counsel argued that there was no evidence that S.B. lacked the capacity to consent, and even if so, there was no evidence that defendant "knew that she lacked capacity."  Rather than respond to defense counsel's argument, the State argued that it had proven force in that on direct S.B. testified that defendant "flipped her in the back seat" and that "she didn't want him to do it."  The State argued that on direct S.B. said she "tried to push him away" and defendant told her "don't tell anyone."  The State argued that S.B. testified on direct that the sex was not consensual.  Over objection, the State argued that on cross-examination defense counsel "was able to take advantage of a disabled person."  The State argued that "in the light most favorable to the State, we met our burden."

¶ 45   The trial court denied defendant's motion as to counts I and II without further argument by the defense.  The court did not comment about the affirmative defense of consent.  The court then discussed at length the cases submitted by the State and entered a judgment of acquittal on count III only.  The court said that S.B.'s testimony "can only be described as not just the words that she spoke but the particular way in which she spoke them."  It further stated, "I don't see

how the appellate court would sustain a conviction under this subsection and I'm required to apply the same standard."

¶ 46    Dr. Locker, a practicing obstetrician/gynecologist at Lutheran General Hospital, testified as an expert witness for the defense.  In addition to being on staff at Lutheran General Hospital, Dr. Locker was vice president of Midwest Center for Women's Health in Skokie, Illinois, which is comprised of 50 OB/GYN physicians.  Dr. Holt, the State's expert, was one of Dr. Locker's colleagues.  Dr. Locker was also a clinical assistant professor of obstetrics and gynecology at Roseland Franklin University of Health Sciences and the Chicago Medical School.  Dr. Locker described a number of awards he had received for excellence in obstetrics and gynecology.  The State did not challenge Dr. Locker's qualifications.

¶ 47    Dr. Locker testified that he had reviewed S.B.'s medical records from the hospital and the police reports.  In addition, he examined two articles from the Journal of the American Osteopathic Association, which is the national publication for osteopaths.  The journal's articles are peer reviewed, meaning they are reviewed by other experts to make sure the "credentials are appropriate and it's an appropriate article."  Dr. Locker relied on the medical records, the police reports, and the peer reviewed articles in forming his opinion.  One of the articles was entitled "Non-Obstetric Lacerations of the Vagina," which was published in 2006.  Dr. Locker explained that the article described women who presented to emergency rooms with vaginal lacerations. The article discussed four different cases, two from alleged rape situations and two from consensual intercourse encounters.  Dr. Locker explained that the four cases, as to the injury reported, were essentially identical.  All of the cases involved significant vaginal lacerations, some requiring blood transfusions.  Dr. Locker discussed S.B.'s injuries that were associated with the sexual encounter with defendant.  According to Dr. Locker, to a reasonable degree of

medical certainty the injuries S.B. sustained "very reasonably were a result of consensual intercourse with Nsoni." Dr. Locker had performed hundreds of vaginal operations. The vagina is a very vascular area and even very small lacerations can bleed quite a bit.

¶ 48     The second article Dr. Locker described was entitled "Defining Patterns of Genital Injury from Sexual Assault Review," from the July 2007 edition of the Journal of Trauma, Violence, and Abuse. This article was also peer reviewed. According to the statistics in the article, 10 to 30 percent of consensual intercourse events result in trauma to the vagina. In Dr. Locker's opinion, to a reasonable degree of medical certainty, even a four-centimeter vaginal laceration can be a result of consensual intercourse. From his experience as a surgeon, the depth of that laceration, one-centimeter, was a "pretty shallow depth." Dr. Locker opined that S.B.'s injuries were consistent with consensual sexual intercourse.

¶ 49     On cross-examination, Dr. Locker testified that he was a member of a referral service that connects doctors with lawyers. He acknowledged that in his career he had seen only one woman who had reported being sexually assaulted. He had testified in civil cases five times for the defense and five times for the plaintiff. He had testified in one other criminal case, for the defense. The referral firm, "Consolidated Consultants," is located in San Diego, California. For his services in this case, he charged a flat fee of $5,000 for his preparation, his travel, and his business lost by closing his office and testifying.

¶ 50     Dr. Locker based his opinion on the articles he referred to on direct, his education and training, and his experience as a physician for around 27 years. He sees patients two or three times a month who complain of vaginal bleeding after intercourse. However, he acknowledged that he had not seen a laceration like S.B.'s.

¶ 51    Defendant elected not to testify and the defense rested. The State called no rebuttal witnesses. Defendant renewed his motion for a directed verdict, which the trial court denied.

¶ 52    In closing argument, ASA Kalcheim-Rothenberg contended that S.B. was a "handicapped woman" who was caught "off guard" by defendant. She referred to S.B. as "a child-like 41 year old woman" and argued that defendant was a "predator" who forcibly and violently raped S.B. According to the prosecutor, defendant's goal was to meet a woman and have sex with her, whether she wanted that sex or not.

¶ 53    Throughout closing argument and rebuttal, the State argued that on cross-examination S.B. "was not allowed to talk," that "she was asked leading 'yes' or 'no' questions," and that she appeared easily confused. The prosecutor claimed that Olnas and Singleton corroborated S.B.'s direct testimony and "not that part where she was easily misled." The trial court overruled defense counsel's objection, admonishing the jury that "[a]ny statement made by the lawyer not based on the evidence *may* be disregarded." (Emphasis added.) The prosecutor continued that what was "really important in showing what happened" was S.B.'s testimony "when she was allowed to talk, allowed to freely talk, shows you what really happened."

¶ 54    Next, the prosecutor argued that Olnas "was confronted by this predator in the dark, alone, her friends were behind her, and he approached her from behind. This is a woman who is not mentally handicapped and was so flustered by this that she couldn't even think to give him a false phone number." The prosecutor reminded the jury that Olnas "broke down on the witness stand and started crying." She then argued that this showed what "[Olnas] thought might have happened to her had her friend not gotten in the car." The court sustained an objection to this remark. The prosecutor then continued her theme that S.B.'s cross-examination testimony was not what happened, because it was only "the first part of her testimony where she was allowed to

use her own words, her own statements as to what happened that night." She claimed that S.B.'s testimony that she held hands with defendant and put his hand on her thigh was contradicted by defendant's conduct in following Olnas. The prosecutor argued, "[t]he only reason [S.B.] answered that way is because she was asked questions that confused her." She argued that Singleton's testimony showed that S.B.'s initial statement, when she was allowed to talk freely, was what really happened that night. She continued to argue that on cross-examination S.B. was "manipulated" and that she was "easily taken advantage of." Despite the fact that the prosecutor herself asked S.B. several yes-or-no questions on direct examination, she argued that "yes or no answers" easily confused S.B. She further contended that "[u]nfortunately for [S.B.], the defendant found the weakest segment of our society to reach his goal." She then summarized S.B.'s direct testimony.

¶ 55    Referring to S.B.'s cross-examination, the prosecutor argued, "[y]ou watched as [S.B.] was led down a path she had no control of. You observed her demeanor. You watched her answer without the capacity to process the questions. The line of questioning does not comport with the evidence, her own words when allowed— ***." Defense counsel objected and the trial court overruled the objection, stating "[c]ounsel may argue." The prosecutor continued to claim that S.B.'s initial testimony was what really happened, because at that point she was "allowed to talk." The prosecutor said, "she was not—she was not asked leading questions. She told you with her own words."

¶ 56    The prosecutor argued that defendant's lies to the police and attempts to cover up evidence corroborated S.B.'s story "when she was actually allowed to tell you her story." The prosecutor said that defendant's denial that he had been at Denny's "shows that he was there, and

he raped her, and that he was trying to cover it up." Likewise, defendant's trying to destroy the Denny's food containers supported S.B.'s testimony "when she [was] allowed to talk."

¶ 57 The prosecutor argued that the testifying doctors together had more than 50 years of experience and that neither had seen "a vaginal injury like this that resulted from consensual sex." She contended that the evidence was "overwhelming" when S.B. was "allowed to tell you in her own words what happened, that's what happened." Concluding, the prosecutor argued that "[d]efendant preyed on a mentally handicapped woman, the weakest part of our society, forced her to have sex with him and then counted on the fact because of her disability, he wouldn't get caught. Well, he was caught."

¶ 58 Defense counsel began his closing argument by explaining to the jury that "cross-examination is a tool of truth seeking." The prosecution objected. The trial court reminded the jury that they were to "consider all the evidence bearing on a particular question without regard to which party elicited it." Defense counsel reminded the jury that, on redirect examination, S.B. knew exactly what "straddled" meant and the words she used were her own, not counsel's. Defense counsel argued that, while "we feel sympathy" for S.B., the jury's verdict must be based upon the law. Counsel argued that defendant's actions were understandable. "He's a married man who had sex with a woman who had bled in the back seat of her car." Counsel then recounted in detail S.B.'s actions and statements after her encounter with defendant and argued that they were not consistent with having been raped. Counsel argued that S.B. was bigger than defendant. "She's 5'9", 145 pounds. You've seen Nsoni, he's two thirds of that. Small." Referring to S.B.'s car, counsel asked, "[t]ell me how it is, through the tiny opening between the two front seats this smaller man, in the words of [another ASA], flung her legs into the back seat and that Nsoni got into the back seat?" Recounting S.B.'s testimony on cross-examination,

counsel reminded the jury that "the State has to prove beyond a reasonable doubt that [S.B.] did not consent." The defense contended that "they have to prove that she did not hold his hand and bring it to her thigh," to which the State objected. The defense argued that the State presented no evidence to prove "that it was not consensual sex beyond a reasonable doubt." Counsel argued that defendant might be a "cad" and a "jerk" but "that doesn't permit us to judge him as a rapist."

¶ 59 Defense counsel claimed that, unlike Dr. Holt, Dr. Locker had reviewed peer reviewed literature that helped him form his opinion. He argued that proving that force was "likely" was not sufficient. The trial court sustained an objection and told the jury that it would instruct them on the law. Counsel argued that the doctors' testimony was interesting in light of S.B.'s answers on redirect that "Nsoni facing her, she straddled him, wrapped her legs around him, had sex with a stranger in the back seat of her car. She said it hurt. That he stopped. Nsoni's penis withdrew. And she was bleeding." Counsel reminded the jury that there was no verbal threat, no physical threat, no weapon, "no force outside of the improbable statement that her legs got flung into the back seat of the car," and no other injuries except a small bruise that was consistent with consensual sex. Counsel said, "I think we should ask [ASA Mathews] if this was by force and not by consent, why did [S.B.] say to [ASA Kalcheim-Rothenberg] 'I wrapped my legs around him'?"

¶ 60 During rebuttal argument, ASA Mathews argued that the State had proven "beyond a reasonable doubt one thing that we all know, this man is a rapist, a self-centered, conniving, cheating, lying, concealing rapist." The prosecutor told the jury, "[Defense counsel] wanted the force instruction. He wanted to focus on one part. Threat of force." The prosecutor conceded that there were no threats, saying, "[h]e didn't have to; you saw for yourself. He didn't have to threaten [S.B.]" The prosecutor then reminded the jury that he told them in his opening

statement that they would see the "same thing Nsoni saw" that night, "a learning disabled woman." Counsel said that S.B. was "easily confused" and "easily led." She was "the perfect victim, the weakest target, the easiest target." He argued that defendant targeted S.B., that he constantly followed her and "made one decision for her—'Oh, yeah, I'm going to penetrate you. I'm going to stuff my penis into your vagina.' " He compared S.B. to a child. Next, ASA Mathews argued that S.B.'s testimony that she straddled defendant did not mean that she consented. Instead, he argued, defendant manipulated her. The prosecutor attributed S.B.'s conduct before, during, and after sex with defendant to her "learning disability." Over objection, the State argued that S.B. did not know where Highland Park Hospital was located. Rather than sustain the objection, the trial court reminded the jury that "arguments not based on the evidence should be disregarded."

¶ 61 The prosecutor argued that when defendant spoke to Olnas in the parking lot he used a "predator line" and that Olnas was thinking that she could have been raped just like her friend S.B. Next, the prosecutor compared Dr. Holt, a doctor "in the trenches" and "in the battle with six other members of her team," to Dr. Locker, who read two articles and a police report. With regard to defense counsel's argument that S.B. had no other injuries, the prosecutor said, "[t]here didn't have to be. He manipulated her." The prosecutor said that the "[l]ack of verbal or physical resistance or submission by the victim, resulting from the use of force or threat of force by the defendant shall not constitute consent." He then said, "[s]o no big deal there is [*sic*] no scratches and bruises or marks."

¶ 62 On the element of force, the prosecutor contended, "[h]e flipped her over the back seat. Counsel wants you to think it's impossible, it's impossible to manipulate a handicapped woman and flip her over the seats. First of all, there is no evidence how strong or lack of strength that

the defendant has. There is no evidence of that." The prosecutor argued that "he's a predator" and that defendant "flung her to the back seat" and "ravaged her." He continued, "[t]here is no evidence in this trial whatsoever how much space is between the driver's seat and the front passenger seat." The prosecutor argued that defendant "took her pants down and shoved his penis into her vagina."

¶ 63    The prosecutor contended that "good old Dr. Locker" did not treat S.B., unlike Dr. Holt, who was "in the trenches." He said that Dr. Locker was "a person that has read two articles, got paid $5,000 and came in here to give an opinion based upon what he read. That's not a bad thing—$5,000 to read a newspaper." After an objection to this remark, the trial court commented, "counsel may argue reasonable inferences *** from the evidence." The prosecutor continued, "[p]oint blank, Dr. Holt told you point blank, she didn't say it's likely, she said this was as a result of a violent sexual assault, point blank." The trial court overruled defense counsel's objection to this remark. The prosecutor again compared Dr. Holt to Dr. Locker. Dr. Holt "was there at ground zero" while Dr. Locker "was at the rent-a-doctor agency sipping a latte, reading two newsletters." The prosecutor argued:

"MR. MATHEWS: "Folks, in the end, the only thing that really many woman [*sic*] own, and we really own at the end, is our integrity. And Dr. Locker sold his for three pieces of silver to come in here and tell you his impression.

MR. STONE: Judge, just objection for the record on that.

MR. MATHEWS: [S.B.] suffered six invasions into her vagina, six. Let me tell you about them. Six invasions into her vagina, three by the predator, three. When he flung her in the back seat, came around in the dark, no one is looking, opened the back door, got on top of her, pounced on top of her, took her pants down and shoved his

penis into her vagina. That's one. When she cried out that she was in pain, it hurt, it's an uncomfortable position, she was hurt, he repositioned himself and stuck it in again. It's two. And the third time, he manipulated her, got on top of her lap, shoved it in her again—that's three. But then there are three other penetrations. Unfortunately, but necessary, necessary surgery. The finger examination by Dr. Holt, it was necessary. The speculum, the metal blade that was shoved into her vagina to try to get to this injury, that's two. The retractor—

MR. STONE: Objection.

MR. MATHEWS: —the retractor—

THE COURT: There was an objection. Again, ladies and gentlemen counsel my [*sic*] argue the evidence, reasonable inferences to be drawn therefrom. Use your own recollection of the evidence. Go ahead, please.

MR. MATHEWS: —the retractor, that had to be used, a longer method to get to the other injury. The indignity of a rape kit. But despite all these, where [*sic*] someone may think are humiliating experiences, whatever, even for this learning disabled woman, she did one thing, she came in here, walked past all 14 of you good people, sat in this witness seat, looking over at you. She had promised this judge that she would tell the truth, and she told you what happened to her on that unfortunate, miserable night where, unfortunately, she was the easiest target. So, despite all that she went through, she came in here and told you what happened to her. Now, let's look at the defendant. Conniving, cheating, concealing, lying, passiveness of guilt. Let's talk about the conniving. Yes, Mr. Stone touched on it a little bit, but let me touch on it a little bit. He saw [Olnas] that night in The Lantern in her scrubs, so what did he do? He took advantage of the

moment—got scrubs, guess what, I work at Lake Forest Hospital. Saw Peter walking around handing out his flyers for his show, said he got a show. The defendant sees this (indicating). What does he say? Oh, I got a party bus. He sees Tychina dancing around, having a good time, she's partying. Are you from Russia? Guess what, I'm from Africa somewhere. Conniving, a cheater. It's more than the fact he committed adultery, that goes to his credibility.

  MR. STONE: Objection. Objection.

  THE COURT: Counsel, approach, please.

(Sidebar conference.)"

¶ 64 During the sidebar, defense counsel argued that the State could not tell the jury that defendant's credibility was at issue when defendant did not testify. ASA Mathews defended the remarks, saying, "[j]udge, it's not about his testimony, it's about when he talked to the officers when he gave his statement to the officers." The trial court said that it took the argument to be a response to defense counsel's explanation for defendant's lies to the police and his conduct in the holding cell. However, the trial court cautioned the prosecutor to be careful and to focus his argument on "specific pieces of evidence." The objection was overruled. The record reveals that the prosecutor was sitting in the witness stand when he was making the above quoted remarks about S.B.'s credibility. Later in his argument the prosecutor said, "[t]he defendant knew that [S.B.] was learning disabled. He raped her and he knew just like a child he had to tell her, '[d]on't tell nobody.' " The prosecutor argued that all of defendant's behavior following his sexual encounter with S.B. showed a "consciousness of guilt." Concluding his rebuttal remarks, the prosecutor argued:

"The defendant's actions corroborated what happened here. Ladies and gentlemen, as I close, in a civilized society one of our priorities is to protect the weakest amongst us. There is nothing more abhorred than the bully who take [*sic*] the lunch in the playground or someone taking advantage of those who are mentally slower than others. [S.B.]'s friends have described her as kind, as a sweet person, child-like. Loves to sing karaoke and have a good time. And that's her thing. All this was—all this is so evident when you saw [S.B.]'s smile. Oh, you should see [S.B.]'s smile. But [S.B.] doesn't want your pity or your sympathy, all [S.B.] wants is justice."

¶ 65    After the jury retired to deliberate, defense counsel moved for a mistrial based on prosecutorial misconduct, where the prosecutor "sat in the witness stand," argued that S.B. had the courage to come into court and testify, and then commented seconds later on defendant's credibility when defendant did not testify. In response, ASA Mathews argued that there was no violation, because his arguments went to what defendant told the police and to his actions. The trial court said that it would give the parties a ruling shortly. Following a discussion regarding exhibits and other matters, defense counsel reminded the court that they were awaiting a ruling on the motion for a mistrial. The court indicated that it would give a ruling after clearing out other matters, referring to other cases on the call. The jury returned their guilty verdict. After the jury was excused, the court denied the motion for a mistrial without commenting on the prosecutor's sitting in the witness stand during rebuttal argument.

¶ 66    Defendant filed a 51-paragraph motion for judgment notwithstanding the verdict or, in the alternative, a new trial. In the motion he raised the following points: (1) the evidence was insufficient to convict; (2) the State failed to disprove consent; (3) the State engaged in a pattern of prosecutorial misconduct during closing and rebuttal arguments, including: (a) arguing to the

jury that S.B.'s cross-examination testimony should be ignored; and (b) commenting from the witness stand about S.B.'s courage and defendant's credibility when defendant did not testify; and (4) the trial court erred in denying defendant's motion for a mistrial. The trial court denied the motion and sentenced defendant to 12 years in the Illinois Department of Corrections.

¶ 67                                II. ANALYSIS

¶ 68    On appeal, defendant first argues that he was not proven guilty beyond a reasonable doubt, because the State failed to prove force and the State failed to disprove his affirmative defense of consent. Next, he argues that the State engaged in a pattern of prosecutorial misconduct during its closing and rebuttal arguments. Finally, defendant argues that his sentence is excessive.

¶ 69                          1. Guilt Beyond a Reasonable Doubt

¶ 70    We agree with defendant that the evidence here was insufficient to convict. Because we strongly disapprove of the State's tactics during closing and rebuttal argument, we have an obligation to also comment on defendant's second contention of error. See *People v. Johnson*, 208 Ill. 2d 53, 65 (2003).

¶ 71    When a defendant challenges the sufficiency of the evidence, a reviewing court must determine whether, viewing all the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *People v. Collins*, 214 Ill. 2d 206, 217 (2005). This standard of review applies regardless of whether the evidence is direct or circumstantial and regardless of whether the defendant was tried before the bench or a jury. *People v. Cooper*, 194 Ill. 2d 419, 431 (2000). When reviewing the evidence, it is not the function of this court to retry the defendant, nor will we substitute our judgment for that of the trier of fact. *People v. Evans*, 209 Ill. 2d 194, 209 (2004). We will not

reverse a conviction unless the evidence is so improbable, unsatisfactory, or inconclusive that it creates a reasonable doubt of the defendant's guilt. *Id*. When a defendant raises the affirmative defense of consent, "the State has a burden of proof beyond a reasonable doubt on the issue of consent as well as on the issue of force." *People v. Haywood*, 118 Ill. 2d 263, 274 (1987). In order to raise an affirmative defense, the defendant must present sufficient evidence. "Sufficient evidence" has been described as "slight" or "some" evidence to support the affirmative defense. (Internal quotation marks omitted.) *People v. Everette*, 141 Ill. 2d 147, 156 (1990). The fact that the fact finder accepted certain testimony does not guarantee its reasonableness. *People v. Smith*, 185 Ill. 2d 532, 541 (1999). Reasonable people can act unreasonably, and while a fact finder's decision to accept testimony is entitled to deference, it is neither conclusive nor binding. *People v. Wheeler*, 226 Ill. 2d 92, 115 (2007). "[A] reviewing court may find, after considering the whole record, that flaws in the testimony made it impossible for any fact finder reasonably to accept any of it." *People v. Cunningham*, 212 Ill. 2d 274, 283 (2004). Although we must allow all reasonable inferences from the record in favor of the State, we may not allow unreasonable or speculative inferences. *Id*. at 280.

¶ 72    After applying these principles to the instant case and examining the reasonableness of the evidence in the light most favorable to the State, we find that the evidence is so unsatisfactory as to justify a reasonable doubt of defendant's guilt.

¶ 73    In order to prove defendant guilty of aggravated criminal sexual assault, the State was required to prove that defendant committed an act of sexual penetration against S.B. by the use of force and caused bodily harm to S.B. 720 ILCS 5/12-14(a) (West 2010). Because defendant raised sufficient evidence of consent, the State was also required to prove that S.B. did not consent to the act of penetration. 720 ILCS 5/12-17 (West 2010). In Illinois, "force or threat of

force" means "the use of force or violence, or the threat of force or violence, including but not limited to the following situations:  (1) when the accused threatens to use force or violence on the victim or on any other person, and the victim under the circumstances reasonably believed that the accused had the ability to execute that threat; or (2) when the accused has overcome the victim by the use of superior strength or size, physical restraint or physical confinement."  720 ILCS 5/12-12(d)(1), (d)(2) (West 2010).  "Consent" means a freely given agreement to the act of sexual penetration or sexual conduct in question.  Lack of verbal or physical resistance, or submission resulting from the use or threat of force by the accused, shall not constitute consent. 720 ILCS 5/12-17 (West 2010).

¶ 74    In this case, the State did not allege or prove that defendant threatened S.B., nor did it allege that S.B. was overcome by "superior strength or size, physical restraint or physical confinement."   There is no definite standard setting forth the amount of force necessary to establish criminal sexual assault by the "use of force," and each case must be considered on its own facts.  *People v. Vasquez*, 233 Ill. App. 3d 517, 527 (1992).  The element of force refers to actions of the defendant that physically compel the victim to submit to the act of sexual penetration.  "Force" within the meaning of section 12-12(d) requires something more than the force inherent in the sexual penetration itself.  *People v. Alexander*, 2014 IL App (1st) 112207, ¶ 54.  A conviction of criminal sexual assault cannot be sustained by establishing merely that the victim did not consent.  *Haywood*, 118 Ill. 2d at 274.  Force is the essence of the crime of rape. *People v. Taylor*, 48 Ill. 2d 91, 100 (1971).  Force can be established by evidence that the defendant used his bodily inertia to prevent the victim from disengaging.  *Id*.  Physical resistance or demonstrative protestations are not necessary to demonstrate that a victim was forced to have sexual intercourse, and the absence thereof does not establish consent if the victim was

threatened or in fear of being harmed. *People v. Brials*, 315 Ill. App. 3d 162, 173 (2000); *People v. Leonhardt*, 173 Ill. App. 3d 314, **3**21 (1988).

¶ 75    Defendant does not dispute that he and S.B. engaged in sexual intercourse. Rather, he asserts that the evidence was insufficient to prove that the sexual intercourse took place by force. He argues that the physical evidence and the testimony produced at trial were more consistent with a consensual encounter than with one procured by force and that the State failed to disprove consent beyond a reasonable doubt. Defendant acknowledges that the testimony of a single witness is sufficient to convict "if it is positive and the witness credible." *Smith*, 185 Ill. 2d at 541. Defendant argues that "[s]ympathy for the learning disabled complainant is not a sufficient substitute for proof beyond a reasonable doubt."

¶ 76    Defendant points out that S.B.'s testimony on direct, that she told defendant to "get off" her, was clarified on cross-examination. She told defendant she was uncomfortable, so they changed positions twice until ultimately, while straddling defendant, she felt pain and they stopped. Defendant points out that S.B. never said she was in fear; defendant never threatened her, nor did he ever strike her; she made no attempt to flee; she did report the incident, but only because she experienced pain and bleeding; she did not wake her parents; she initially told hospital personnel that the bleeding was spontaneous; there were no other significant injuries to S.B.'s body; and Dr. Holt conceded that it was possible that the injuries to S.B.'s vagina could have been the result of consensual sex. Defendant maintains that, when viewed in its entirety, the evidence fails to establish that defendant either passively or violently forced S.B. to have, or to continue to have, sexual relations with him. In support of his arguments, defendant cites *Vasquez*, 233 Ill. App. 3d 517, *People v. Denbo*, 372 Ill. App. 3d 994 (2007), and *People v. Warren*, 113 Ill. App. 3d 1 (1983).

¶ 77    *Vasquez* involved a sexual encounter between an adult male defendant and a minor male victim. The criminal-sexual-assault charges alleged that the defendant forced the victim to perform oral sex on him. The appellate court noted that the "only evidence tending to show that force was applied by the defendant during the two oral sex acts with P.L. was that the defendant placed his hand on the back of P.L.'s head and 'forced' P.L.'s head down onto the defendant's penis." *Vasquez*, 233 Ill. App. 3d at 527. The appellate court stated that the purported use of force "was rendered improbable by the facts" (*id.*) that the victim:

> "did not try to leave the car while the defendant was outside urinating; he did not cry out for help; he remained in the car even after the defendant's attempts to achieve anal intercourse; he acknowledged the defendant did not threaten to hurt him ***; he allowed the defendant to drive him to his home; he did not tell anyone about what had happened and he was unable to explain why he was 'scared.' " *Id*.

¶ 78    The appellate court, similarly, said that a second allegation of forced oral sex was rendered improbable by the evidence that the victim did not seek assistance from other pedestrians in the area and did not tell anyone until "he had a motive to disavow any willing participation." *Id*. at 528. The appellate court noted that "a failure to cry out or to resist does not establish consent in sex cases if the victim is threatened or in fear of being harmed." *Id*. The court explained, however, that "P.L. was neither threatened nor in fear of being harmed by the defendant here." *Id*. at 530. The court concluded that evidence of the victim's behavior "belies his testimony that he was forced to engage in the oral sex act." *Id*. at 529. The defendant's criminal-sexual-assault convictions were reversed.

¶ 79    The *Denbo* case involved an allegation of forced sexual penetration by an adult female defendant against an adult female victim. The defendant and the victim had a romantic

relationship. The victim stayed overnight at the defendant' house. The victim testified that she was on the defendant's bed when the defendant came into the bedroom and took her clothes off. The victim testified that the defendant " 'shoved [her], and she was rough.' " *Denbo*, 372 Ill. App. 3d at 996. When the victim was asked what happened next, she said, " '[w]ell, then she went right through my vagina. I didn't scream. I didn't do anything. I knew the kids were asleep. Knew the kids were asleep[,] and she kept pushing me.' " *Id*. The victim described the defendant as kneeling on top of her, spreading her legs apart. The victim said she tried twice to push the defendant back. The victim noticed she was bleeding from her vagina. The prosecutor asked the victim if she had consented to " 'this touching.' " *Id*. at 999. The victim said no, she did not consent. On cross-examination, the victim acknowledged that she did not try to stop the defendant from removing her clothes. She admitted that she spent the rest of the night with the defendant in her bed. On redirect examination, the prosecutor asked the victim why she did not immediately leave, and the victim said she wanted to know why the defendant hurt her. *Id*. at 1000. The victim's treating physician testified that she examined the victim three days after the encounter. The victim's vagina was " 'very abraded,' " like a rug burn, and possibly bled at the time of injury. *Id*. The defendant testified that the encounter was consensual. She acknowledged that the victim " 'nudged' " her while the defendant was performing oral and digital sex on the victim's vagina, but she said that the victim never told her to stop or pushed her away. *Id.* at 1003. On appeal, the State conceded that the victim " 'implicitly consented to some sort of penetration by allowing defendant to undress her, to spread her legs apart, and to position herself between [the victim's] legs.' " *Id.* at 1006. The State argued that the case involved "postpenetration aggravated criminal sexual assault" (*id.*) pursuant to section 12-17(c) of the Criminal Code of 1961 (720 ILCS 5/12-17(c) (West 2004) ("A person who initially consents to

sexual penetration or sexual conduct is not deemed to have consented to any sexual penetration or sexual conduct that occurs after he or she withdraws consent during the course of that sexual penetration or sexual conduct.")). *Denbo*, 372 Ill. App. 3d at 1006.

¶ 80    The appellate court in *Denbo* rejected the State's "postpenetration" theory. The court noted that one could infer that the victim pushed the defendant "because disengagement was, for her, physically impossible until defendant withdrew." *Id.* at 1008. The court explained that the defendant withdrew when the victim pushed her a second time. The court said, "[i]f an aggravated criminal sexual assault happened at all, it happened during the very short duration between the first and second push, when defendant, by not moving, prevented [the victim] from immediately disengaging." *Id.* The court concluded that, even though the victim no longer consented, "her withdrawal of consent was ineffective until she communicated it to defendant in some objective manner [citation] so that a reasonable person in defendant's circumstances would have understood that [the victim] no longer consented." *Id.* The court noted that the victim could have said no instead of pushing the defendant. It said, "[t]he problem is, people push one another during sexual congress." *Id.* The defendant's conviction was reversed. We note that in the present case the State did not allege, and the jury was not instructed to consider, a theory of postpenetration withdrawal of consent.

¶ 81    Defendant argues that *Warren*, 113 Ill. App. 3d 1, stands for the proposition that S.B. was required to show in some objective manner a lack of consent. In *Warren*, after just meeting the victim and engaging in a brief conversation, the defendant told the victim, " '[m]y girlfriend doesn't meet my needs' " and " 'I don't want to hurt you.' " *Id.* at 3. He then carried the victim into the woods and performed oral sex on her, and the victim performed oral sex on the defendant. The defendant then carried the victim back to her bicycle. The victim reported the

incident. In reversing the defendant's conviction of deviate sexual assault, the appellate court noted that, despite professing fear for her safety, the victim conceded that the defendant did not strike her or threaten to strike her or use a weapon. *Id*. at 5. The court said:

> "In the case before us, defendant maintains that once complainant became aware that defendant intended to engage in sexual relations it was incumbent upon her to resist. This resistance would have the effect of giving defendant notice that his acts were being performed without her consent. It is well settled that if complainant had the use of her faculties and physical powers, the evidence must show such resistance as will demonstrate that the act was against her will. If the circumstances show resistance to be futile or life endangering or if the complainant is overcome by superior strength or paralyzed by fear, useless or foolhardy acts of resistance are not required. [Citation.] We cannot say that any of the above factors are present here. Complainant's failure to resist when it was within her power to do so conveys the impression of consent regardless of her mental state, amounts to consent and removes from the act performed an essential element of the crime. [Citation.] We do not mean to suggest, however, that the complainant did in fact consent; however, she must communicate in some objective manner her lack of consent." *Id*. at 6.

¶ 82 Defendant acknowledges that a person can passively force someone to continue with an act of sexual penetration by using one's bodily inertia to prevent the victim from disengaging. *Alexander*, 2014 IL App (1st) 112207, ¶ 54. Defendant argues, however, that according to S.B.'s testimony he did not prevent her from disengaging; instead, when S.B. expressed discomfort they stopped and repositioned.

¶ 83    The State responds to defendant's reliance on *Denbo*, *Vasquez*, and *Warren* by arguing that the instant case is more like *People v. Carlson*, 278 Ill. App. 3d 515 (1996), and *People v. Bowen*, 241 Ill. App. 3d 608 (1993).  We disagree.

¶ 84    In *Carlson*, the defendant sexually assaulted the victim inside his car after the victim had been drinking in bars.  The victim met the defendant in a bar.  They decided to go to another bar next door, but it was closed.  They kissed and got into the defendant's car.  The defendant drove the car around the corner onto a dark street and put the vehicle in park.  The victim testified that " 'everything went crazy' " and she recalled the seat reclining and her " 'flying back in the seat.' "  *Carlson*, 278 Ill. App. 3d at 517.  The victim testified that the defendant put his hands in her pants and that she begged him to stop.  The defendant pulled her pants down and stuck his fingers in her vagina.  She kept saying no and again begged him to stop.  She did not cooperate when the defendant pulled her pants down.  After performing oral sex on the victim, the defendant then had vaginal intercourse with her while she continued to beg him to stop.  The victim said she was " 'frozen' " and " 'terrified.' "  *Id.*  After the encounter, the defendant drove the victim back to the bar.  Witnesses described her as "disheveled" and "crying."  *Id*. at 518.  The victim told her sister that someone hurt her and "raped" her.  *Id*. at 518-19. Family members took the victim to the hospital.  In affirming the defendant's conviction, the appellate court noted that, when defense counsel asked the victim if she ever tried to escape, she replied, " 'I was frozen.  I didn't know what to do.  I was frozen.  I couldn't move.  I was terrified.' "  *Id*. at 521.  The court said, "[s]urely, this testimony, which the [trial] judge believed to be true, is evidence that M.O. was 'paralyzed by fear' under *Warren*[,] 113 Ill. App. 3d at 6."  *Id.*

¶ 85    In *Bowen*, the victim was a college student.  She lived in an apartment with her roommates.  The defendant was an overnight guest of one of her roommates.  The defendant

entered the victim's bedroom without permission, got onto her bed, and straddled her. The victim repeatedly told the defendant to stop, to leave, and tried to push his hand away to prevent him from penetrating her vagina. The defendant removed the victim's clothes and forced his penis inside her vagina. The victim was able to push the defendant's penis out of her and got out of the bed. The victim testified that she did not scream because "she could not believe what was happening, thought she could control the situation, and was scared." *Bowen*, 241 Ill. App. 3d at 612. After the sex, the victim's roommate opened the bedroom door. Immediately after the defendant left, the victim told her roommate that the defendant had attacked her. *Id*. at 613. The victim was "crying and was hysterical." *Id.* She told her friends that she had been raped. The victim's friends drove her to the hospital. The victim told the treating physician that she had been "sexually assaulted." *Id*. at 613-14. The victim did not report the sexual assault to a police officer who was present, because the defendant was friends with the brother of her roommate Janice, who was with her at the time. In affirming the defendant's conviction, the appellate court commented that the victim gave a detailed account of what occurred and "explicitly testified she did not consent." *Id*. at 619. The appellate court rejected the defendant's argument that the victim's testimony was unbelievable because she did not "promptly report the incident." *Id.* at 620. The court noted that the victim reported the assault to her friends, her boyfriend, and two next-door neighbors and was then taken to the hospital. *Id.* While we agree that the failure to "cry out for help or try to escape" is not determinative on the issue of whether a victim was forced or whether she consented, the issue depends on "the circumstances of each case." *Id.* We find the facts and circumstances of *Bowen* to be far different from the facts of the instant case. The victim in *Bowen* gave detailed testimony, she testified that she was scared, and she made a prompt complaint.

¶ 86    In the instant case, S.B. never said she was in "fear" or "terrified."  The sexual encounter took place in the parking lot of a restaurant that was open for business, yet instead of seeking help from people inside the restaurant S.B. drove off.  Additionally, unlike in *Carlson* and *Bowen* there was no prompt complaint by S.B. that she had been raped.  Rather than reaffirming what she said on direct, S.B.'s cross-examination testimony was, by the State's own concession at trial, consistent with defendant's defense of consent.

¶ 87    The State argues that "there was much evidence to establish the use of force by defendant."  The State refers to Dr. Holt's opinion testimony that the injuries to S.B.'s vagina "indicated sexual assault."  Prior to trial, the State moved *in limine* to allow Dr. Holt to give her opinion that S.B.'s injuries were the result of a sexual assault, citing *People v. Blair*, 2011 IL App (2d) 070862.  In *Blair*, the defendant was charged with aggravated domestic battery.  X-rays revealed that the victim had a broken nose.  *Id.* ¶ 3.  The victim's treating physician gave an opinion that the injury was the result of blunt force trauma.  *Id.* ¶ 13.  In this case, the trial court allowed both Dr. Holt and Dr. Locker to give their opinions subject to foundation.  As we have described, Dr. Holt's opinion was based on her education, training, and experience.  She acknowledged that S.B. originally reported to hospital personnel that the bleeding was "spontaneous."  Later, after speaking "in some depth" to a social worker, S.B. said "yes" when asked whether she had been assaulted.  Although Dr. Holt had not been familiar with the Journal of the American Obstetrics Association, she said she had seen the article that Dr. Locker provided and then acknowledged that the injuries could have occurred from consensual sex.  She had no information regarding the size of defendant's penis and had not seen the police reports.  Dr. Holt was asked, "[y]ou're not saying to a reasonable degree of medical certainty that

something couldn't have happened because you haven't seen it?"  Over objection, Dr. Holt said "[y]es.  Yes, that's correct."

¶ 88    In the instant case, the trial court allowed expert opinion testimony because it felt that the testimony would assist the jury in understanding the evidence.  Ill. R. Evid. 702 (eff. Jan. 1, 2011).  "A trial court is not required to allow an expert to render an opinion on every conceivable question simply because such expert is qualified to do so."  *People v. Cloutier*, 156 Ill. 2d 483, 502 (1993).  In *Cloutier*, the defendant was convicted of felony murder based upon an aggravated criminal sexual assault resulting in the death of the victim.  The victim had no injury to the genitals.  The deputy medical examiner who conducted the autopsy stated that the lack of injury did not rule out "forced sexual intercourse."  *Id.* at 501.  The defendant sought to ask the witness "generally whether injury is more consistent with the use of force."  *Id*. at 502.  The trial court sustained an objection to the question.  On appeal, the supreme court held that the trial court did not abuse its discretion in sustaining the objection.  The court noted that all of the questions to which the defendant objected "concerned this expert's experience with other victims."  (Emphasis omitted.)  *Id*.  The court also said that, absent recall of the number of forced-sex victims who had not suffered injury to their genitals, any opinion on "consistency or lack thereof" would have been "speculative and uncertain."  *Id*.

¶ 89    An expert's opinion is only as valid as the reasons for the opinion.  *Soto v. Gaytan*, 313 Ill. App. 3d 137, 146 (2000).  Here, Dr. Holt's opinion was based exclusively on the injuries to S.B.'s vagina, in light of her training and experience.  Our research has revealed that, in cases involving vaginal injuries where physicians gave opinions that the victims were sexually assaulted, the foundations for these opinions included more facts to support the opinions than just the vaginal injuries.

¶ 90    The Illinois Supreme Court, in *People v. Harris*, 132 Ill. 2d 366 (1989), explained that in the past a physician could not testify to his opinion that a victim had been sexually assaulted. *Id*. at 385. This rule was based on the premise that "an expert's expression of an opinion on an ultimate issue could only invade the fact-finding role of the jury." *Id*. The court explained, however, that current case law permits the expert to testify to an opinion on an ultimate issue in a case. *Id*. (citing *Merchants National Bank v. Elgin, Joliet & Eastern Ry. Co.*, 49 Ill. 2d 118, 122 (1971)).

¶ 91    In *Harris*, the defendant objected to the pathologist's expert opinion that the deceased victim had been sexually assaulted. The defendant argued that the testimony went to the heart of his defense "that his sexual activity with the victim was entirely consensual." *Id.* at 384. As noted, the supreme court explained that an expert's opinion on the ultimate issue is now allowed. The court explained both that the expert, Dr. Donoghue, was qualified to render an opinion and that there was a proper basis (foundation) for the opinion. *Id*. at 385. The court stated:

> "We believe that the basis for his opinion could properly include not only the medical evidence concerning the nature and extent of the victim's injuries, but also the other circumstances referred to, including the evidence pertaining to her disappearance and eventual discovery." *Id*.

¶ 92    Dr. Donoghue testified that an external examination of the victim revealed "16 evidences of injuries." *Id*. at 377. She had sustained a number of "abrasions around her neck, a hemorrhage to the eyelid, a swelling on the forehead, two gravel-encrusted abrasions on the right cheek, bruises on both the upper and lower lips, and abrasions on her right leg." *Id*. Dr. Donoghue testified that the victim had been strangled. She also suffered "10 evidences" of internal injuries. *Id*. Dr. Donoghue said that "the injuries to the victim's perineum and pelvis

also were consistent with blunt force trauma" and that he believed that the victim had been sexually assaulted. *Id*. at 378.

¶ 93    Dr. Donoghue said that the basis for his opinion included the facts that the victim was found in a remote location; her clothes were in disarray; her panties had been removed; she had massive injuries to the pelvis and the area between the rectum and the vagina; and she was strangled. *Id*. at 384. On cross-examination, Dr. Donoghue testified that, although the injuries to the pelvis and perineum were severe, they could "have been caused by vigorous sexual intercourse." *Id*. at 378.

¶ 94    Expert opinion testimony from a treating physician that the victim's vaginal injuries were the result of nonconsensual intercourse was also held to be proper in *People v. Byrd*, 206 Ill. App. 3d 996 (1990). There, the appellate court held, "[t]he basis for an expert's opinion may properly include not only medical evidence concerning the nature and extent of injuries sustained *but also the surrounding circumstances of the crime*." (Emphasis added.) *Id*. at 1004. In *Byrd*, the victim testified that two men had sexually assaulted her in an apartment after she was beaten and threatened. After managing to escape, the victim approached a security guard. She was "badly shaken and crying." *Id*. at 1001. The victim was taken to the hospital and treated for "edema, bruises around both eyes and cheekbones, and abrasions on her buttocks and thighs." *Id*. at 1002. She was bleeding "due to a 4-inch V-shaped laceration on the left side of her vagina." *Id*. The appellate court noted that the physician's opinion was based upon the extensiveness of the victim's injuries, *i.e.*, the four-inch laceration in her vagina. The physician also testified that the victim sustained injuries to her head. *Id*. at 1004.

¶ 95    Here, defendant does not contest the trial court's ruling allowing Dr. Holt's expert opinion. Rather, he argues that in the absence of any other significant injuries to S.B.'s body, or

other objective evidence of force, and given Dr. Holt's concession that the injuries could have resulted from consensual sex, Dr. Holt's opinion does not reasonably establish the element of force. Defendant points out that Dr. Locker reviewed all of the medical records, the police reports, and peer reviewed literature on the subject of vaginal lacerations.

¶ 96    Our review of the expert testimony should in no way suggest that evidence of injury is necessary to prove force or that the absence of injury establishes that the victim consented. In fact, the law is to the contrary. *Cloutier*, 156 Ill. 2d at 504; *Bowen*, 241 Ill. App. 3d at 620. However, our examination of the expert testimony is consistent with our obligation to "carefully examine the evidence adduced at trial." *People v. Ortiz*, 196 Ill. 2d 236, 267 (2001). "Expert witness evidence is to be allowed with caution and should not be overused when it fails to aid the jury." *Cloutier*, 156 Ill. 2d at 501. Again, an expert's opinion is only as valid as the reasons for the opinion. *Soto*, 313 Ill. App. 3d at 146. Without having been given the police reports or asked any hypothetical questions based upon the facts adduced at trial, Dr. Holt's opinion that S.B.'s vaginal injuries were very likely caused by a sexual assault amounts to speculation and conjecture on what might have happened to S.B. Details of the encounter between S.B. and defendant were withheld from Dr. Holt, which might have affected her opinion. See *People v. Judge*, 221 Ill. App. 3d 753, 762 (1991). Dr. Holt was apparently never made aware that the sex occurred in the confines of a small SUV, that there were three acts of uncomfortable intercourse as opposed to the one act charged, and that in the final act of penetration S.B. was on top, straddling defendant. Dr. Holt's opinion that S.B.'s injuries were the result of a sexual assault lacks evidentiary force because it was based upon her experience with "other victims" as opposed to the specific details of S.B.'s encounter with defendant. See *Cloutier*, 156 Ill. 2d at 502 (opinion rendered on the consistency or lack thereof of injury in instances of forced sex

would have been speculative and uncertain where the expert could not recall the number of forced-sex victims who had not suffered injury). In denying defendant's posttrial motion, the trial court commented:

"In the end, opinion witnesses are allowed to speculate with a hypothetical. That's the whole purpose of an opinion witness. So the objection that the testimony was speculative doesn't lie, and even, even if that—the objection is that she testified to a questionable [*sic*] issue, again, the Supreme Court has found that that's not a problem, so I don't see any issue with that."

However, defendant's objection to Dr. Holt's testimony was not that it went to the ultimate issue or that she was not qualified to render an opinion. Defendant's objection was the lack of a sufficient foundation or "basis of her opinion," which is a separate question. Ill. R. Evid. 703 (eff. Jan. 1, 2011).

¶ 97 Defendant argues that S.B.'s testimony that he "flung" her legs into the backseat is unlikely because she was taller and heavier than he. In response, the State notes that it has found no evidence of height and weight in the record. The State forgets that it was its burden to prove force beyond a reasonable doubt and further to disprove consent beyond a reasonable doubt. *Haywood*, 118 Ill. 2d at 274. The State argues that "it is not impossible for a smaller person to be stronger than a larger person, especially when the smaller person is a 25-year-old male and the larger person is a 39-year-old female." We reject the State's argument. If the State intended to rely on defendant's physical superiority, it should have adduced evidence to support that theory. See *Cloutier*, 156 Ill. 2d at 504 (trier of fact could have concluded that absence of injury was the result of defendant's superior size and strength). Contrary to the State's argument, there is evidence in the record showing that S.B. was taller and heavier than defendant. Photographs

and video images support defense counsel's characterization of defendant as two-thirds S.B.'s size.

¶ 98     Regarding the issue of consent, as it did at trial, the State notes that "there was testimony regarding the victim's limited mental ability."  The State argues that S.B.'s "lack of resistance" after her initial verbal and physical attempts to stop defendant was the result of her limited understanding and her confusion about the situation after defendant's show of force by throwing her legs into the backseat and mounting her.  The trial court entered a directed verdict, which was an acquittal, on count III, resolving factual issues related to S.B.'s learning disability. *Harris*, 132 Ill. 2d at 392.  The State acknowledged during argument on defendant's posttrial motion that it relied, in part, on S.B.'s disability to prove force.  The ASA said, "we didn't rely— our argument was not based solely upon the mental functioning of S.B.  It was based on the totality of force."  Certainly, the State's argument that S.B.'s learning disability might explain her confusion was fair game, but that argument is not a substitute for proving force or disproving consent.  We do not believe that a reasonable juror could accept the State's version of events. S.B.'s testimony was so lacking in detail that, even without the cross-examination testimony, we would find it highly improbable.  For example, we do not know where, when, or how S.B.'s pants and panties were removed.  Yet, despite the lack of any evidence on this detail, the prosecutor argued in rebuttal that defendant "took her pants down."

¶ 99     S.B.'s cross-examination testimony, unlike her direct testimony, was corroborated by other evidence.  S.B. admitted that she and defendant kissed.  DNA taken from S.B.'s neck, both the left and right sides, matched defendant's DNA.  S.B. acknowledged that after both the first and second attempts at intercourse she complained that she was uncomfortable and they changed positions.  Finally, with defendant seated in the backseat, S.B. straddled defendant with his penis

entering her vagina. Again, S.B. complained, this time telling defendant she felt pain. Rather than complete the act, defendant withdrew. When they noticed blood, defendant wiped the blood from his penis with his shirt. He hugged S.B. She picked up his cell phone and handed it to him. Defendant said "don't tell anyone" and left the area. Notably, the police submitted swabs taken from the blood stains where the acts of intercourse occurred. There was no seminal material found, which is consistent with S.B.'s testimony on cross-examination that defendant stopped when he was asked to stop. We also note that Groce's testimony, that when she left the Denny's parking lot S.B. was behind the steering wheel and defendant was standing 20 feet away, impeached S.B.'s testimony that she got into her car and then defendant got in on the passenger side.

¶ 100   Although the State does not argue that defendant's behavior after his encounter with S.B. showed consciousness of guilt, in order to be thorough we choose to address it. After the encounter defendant told S.B. not to tell anyone. He went home and washed his clothes, which was unusual for him. He lied to the police about being at Denny's or meeting S.B., and he was caught destroying food containers from Denny's out of fear that he was being framed. While this evidence was relevant and material, it is not a substitute for credible evidence of force or lack of consent. Moreover, defendant's argument that he and S.B. were both married and did not want to be discovered is not unreasonable.

¶ 101   The State argues that S.B.'s testimony on cross-examination that she held hands with defendant and guided her hand onto her thigh at Denny's was called into question by other witnesses in the group. The State, again as it did at trial, argues that "it is possible that the victim was confused during cross-examination." We reject this specious argument. There was no evidence that S.B. was confused or that she lacked the capacity to understand defense counsel's

questions or recall events. In fact, defense counsel was very respectful and even apologized for having to ask embarrassing questions. To make sure that there was no confusion, on recross-examination defense counsel again asked S.B. whether she held hands with defendant and guided his hand to her thigh. To both questions she answered yes.

¶ 102   The time to establish that S.B. might have been confused or to correct any inaccuracies or contradictions with her direct testimony was at trial when S.B. was on the witness stand. On redirect examination, the State had the opportunity to ask questions designed to remove any unfavorable inferences or impressions brought out on cross-examination. *People v. Desantiago*, 365 Ill. App. 3d 855, 866 (2006). In contrast to impeaching evidence, which seeks to destroy the credibility of a witness, the cross-examination of S.B. supplied substantive factual information that must be considered along with the other evidence in the case. This evidence alone was sufficient to raise the affirmative defense of consent, which the State failed to disprove. The partial dissent states, "[t]he victim never recanted or retracted her testimony concerning force and lack of consent." *Infra* ¶ 130. We disagree. Both the trial court and the State viewed S.B.'s cross-examination as having established consent. See *supra* ¶ 19. We agree with that assessment.

¶ 103                              B. Prosecutorial Misconduct

¶ 104   Next, defendant argues that this case should be reversed based upon prosecutorial misconduct. Specifically, he refers to several comments made by both ASAs in closing and rebuttal argument.

¶ 105   Both trial and reviewing courts have an obligation to take steps to stem prosecutorial misconduct. *People v. Johnson*, 208 Ill. 2d 53, 64-67 (2003). We are reasonably certain that but for the prosecutors' improper remarks during closing and rebuttal argument the jury's verdict

would have been not guilty. We choose to address this issue in the hope that such tactics will not be employed in the future.

¶ 106   Prosecutors are afforded a great deal of latitude in closing argument; they may comment on the evidence and all reasonable inferences drawn therefrom. *People v. Blue*, 189 Ill. 2d 99, 127 (2000). Arguments must be viewed in their entirety and allegedly erroneous arguments must be viewed contextually. *Id*. at 128. Arguments that serve only to inflame the jury constitute error. *People v. Tiller*, 94 Ill. 2d 303, 321 (1982).

¶ 107   Here, the trial court did not inform the jury that it had entered a directed verdict on count III, which alleged that defendant knew that S.B. "was unable to give knowing consent." The acquittal on count III " 'actually represents a resolution, correct or not, of some or all of the factual elements of the offense charged.' " *People v. Henry*, 204 Ill. 2d 267, 283 (2003) (quoting *United States v. Martin Linen Supply Co.*, 430 U.S. 564, 571 (1977)). While the jury was instructed that "[a]ny evidence that was received for a limited purpose should not be considered by you for any other purpose" (Illinois Pattern Jury Instructions, Criminal, No. 1.01(7) (4th ed. 2000)), they were never informed that the issue upon which evidence of S.B.'s learning disability had been received was no longer before them. We note that defendant did not request such an instruction. However, that oversight by the defense did not give the State license to argue, for example, "[c]ounsel talks about there is no scratches. No marks. There didn't have to be. He manipulated her" and "[b]ut straddled doesn't mean that she consented. He manipulated her." By its own admission, the State used evidence admitted for one purpose, ability to consent, to establish the element of force. These arguments were clearly improper. The State knew that it had failed to establish that S.B. was unable to consent and that defendant knew as much, yet argued repeatedly that the jury should consider S.B.'s "disability" on the issue of force in that

defendant "manipulated" S.B. During its closing and rebuttal arguments, the State made 21 direct references to S.B.'s intellectual limitations. We agree with defendant that the prosecutors used S.B.'s learning disability to confuse the jury on the issue of consent. It is improper for the prosecution to direct the jury's attention away from the elements of the crime to issues irrelevant to the question of guilt or innocence. *People v. Schneider*, 375 Ill. App. 3d 734, 755 (2007) (citing *People v. Moore*, 356 Ill. App. 3d 117, 120 (2005)).

¶ 108 The State argues that S.B.'s disability was relevant to explain her behavior after the sexual encounter with defendant. However, that was not how the State argued this evidence at trial. Throughout closing and rebuttal argument, the State painted S.B. as a "child-like" woman who was "easily confused, easily manipulated, and easily taken advantage of because of her disability."

¶ 109 Defendant argues that the State's repeated references to him as a "predator" were improper. A predator has been defined as "one that preys, destroys, or devours" or "an animal that lives by predation." Merriam-Webster Dictionary, http://www.merriam-webster.com/dictionary/predator (last visited Nov. 12, 2015). In its closing argument, the State called defendant a predator three times. In rebuttal, it again repeatedly called defendant a predator. The State depicted defendant as a "predator" who took "a piece of meat" home with him. Each of these comments was clearly improper and was an attempt to cultivate anger toward defendant.

¶ 110 Defendant also argues that the State's rebuttal argument attacking the integrity of Dr. Locker was improper. We note that the State did not challenge Dr. Locker's qualifications as an expert. Yet, during its rebuttal argument, it argued that Dr. Locker "was at the rent-a-doctor agency sipping a latte" and that he sold his integrity "for three pieces of silver." At the same

time, the State misstated Dr. Holt's testimony, arguing that "Dr. Holt told you point blank, she didn't say it's likely, she said this was as a result of a violent sexual assault, point blank." The trial court characterized the State's remarks about Dr. Locker as sarcasm. We find that these statements were clearly improper. The State argues that it did not use the phrase "cash for trash," which our supreme court condemned in *People v. Moss*, 205 Ill. 2d 139, 170-71 (2001). The State's distinction is meaningless. The aim was the same—to improperly denigrate Dr. Locker in the eyes of the jury. The State's argument that Dr. Holt testified "point blank" that this was a case of sexual assault was an improper misstatement of the evidence. *People v. Carbajal*, 2013 IL App (2d) 111018, ¶ 29 (it is improper for a prosecutor to misstate the law or evidence). Misrepresenting or overstating the opinion testimony of an expert witness is improper. *People v. Linscott*, 142 Ill. 2d 22, 39 (1991). Moreover, the trial court overruled defense counsel's objection to this argument. By overruling the objection, the trial court gave the jury the false impression that the prosecution accurately related Dr. Holt's opinion. See *People v. Hope*, 116 Ill. 2d 265, 278 (1986) (overruled objection amplifies the prejudicial effect of prosecutorial misconduct); *People v. Fluker*, 318 Ill. App. 3d 193, 203 (2000). Misstating evidence in rebuttal is even more damaging, since the defendant "has no opportunity to make a response." *People v. White*, 134 Ill. App. 3d 262, 280 (1985). Likewise, the State's rebuttal arguments that S.B. did not know where Highland Park Hospital was located and that defendant removed S.B.'s clothes were misstatements of the evidence.

¶ 111 Defendant argues that the State violated his right to confront and cross-examine when, during closing argument, the prosecutors repeatedly argued that S.B.'s testimony on cross-examination was not her own words, but instead was the product of her being "led down a path she had no control of." There was no evidence in the record from which it could reasonably be

inferred that S.B. had any difficulty in understanding defense counsel's questions. "Unless predicated on evidence that defense counsel behaved unethically, it is improper for a prosecutor to accuse defense counsel of attempting to create reasonable doubt by confusion, misrepresentation, or deception." *Johnson*, 208 Ill. 2d at 82. When defense counsel objected to these comments, the trial court overruled the objection, reinforcing the impression that the jury could ignore S.B.'s cross-examination testimony because her answers were not "her own words."

¶ 112    Due process requires a fair opportunity to defend against criminal accusations, and any limitation on the right to confront and cross-examine witnesses requires close examination. *Chambers v. Mississippi*, 410 U.S. 284, 294-95 (1973); see U.S. Const., amend. VI; Ill. Const. 1970, art. I, § 8. "Cross-examination is the principal means by which the believability of a witness and the truth of his testimony are tested." *Davis v. Alaska*, 415 U.S. 308, 316 (1974). "[T]he Confrontation Clause guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." (Emphasis in original.) *Delaware v. Fensterer*, 474 U.S. 15, 20 (1985). As the trial court noted, S.B. gave defendant a "great" cross-examination. By arguing repeatedly, with no evidentiary support, that S.B.'s cross-examination answers were not "her own words," the State violated defendant's right to confront witnesses. The credibility of S.B.'s cross-examination testimony was crucial to defendant's defense. By telling the jury that they should ignore it because it was not "her own words," the State undermined defendant's right to a fair trial. The damaging and likely prejudicial effect of the State's argument that S.B.'s answers on cross-examination were not "her own words" is obvious. The jury clearly believed that the facts about the encounter were as the prosecutor presented them and not a consensual encounter, as S.B.'s cross-examination established.

¶ 113 Finally, we address defendant's argument that ASA Mathews engaged in prosecutorial misconduct by sitting in the witness stand while arguing about S.B.'s courage in testifying, and then commenting on defendant's "credibility." During a lengthy sidebar conference, defense counsel argued that defendant's credibility was not at issue, because he did not testify. The court accepted the State's explanation that it was referring to defendant's statement to the police and was not commenting on defendant's failure to testify. The court cautioned the State to focus its argument on "specific pieces of evidence" and overruled the objection. Defense counsel asked if he could make a record and the court said, "[s]ure. Make it afterwards." After the jury was instructed, defendant moved for a mistrial, which was denied after the jury returned their verdict. The prosecutor did not deny that he sat in the witness chair and argued S.B.'s credibility and discussed defendant's "credibility" before an objection was made. Challenged remarks are reviewed in the context of the entire proceeding when determining whether the accused's right not to testify has been violated. *People v. Arman*, 131 Ill. 2d 115, 126 (1989). In the instant case, defense counsel said in his opening statement that defendant would testify. Defendant later decided that he would not testify. Whether intentionally or not, by arguing S.B.'s courage and then transitioning to defendant's credibility, the prosecutor might have reminded the jury that defendant did not testify, especially when the argument was made from the witness chair. Indeed, the most troubling aspect of ASA Mathews' conduct was leaving the podium and sitting in the witness chair to argue the victim's credibility and courage and then discussing defendant's credibility. There is no question that this tactic was designed to evoke sympathy for S.B. and disgust for defendant. While seated in the witness chair, ASA Mathews said, in part:

"So despite all that she went through, she came in here and told you what happened to her. Now, let's look at the defendant. Conniving, cheating, concealing, lying, passiveness [*sic*] of guilt."

¶ 114 The State defends the prosecutor's behavior by noting that "[d]efendant cites no case that a party cannot sit in the witness chair." There does not need to be a case precedent to establish that certain conduct is improper. Many practices and customs have been historically followed in the trial process. Some have been reduced to writing in the form of court rules, rules of professional conduct, or statutes. There is no rule on seating, but only attorneys and their clients are permitted to be seated at counsel table during the course of a trial. However, it is within the trial court's discretion to permit a witness to remain in the courtroom and to sit at counsel table for the purpose of assisting the State's Attorney. *People v. Leemon*, 66 Ill. 2d 170, 174 (1977). Recently, the First District Appellate Court noted that allowing one side's expert witness to sit at counsel table would not only create an unfair advantage but also "unfairly elevate the importance of this witness's testimony in the eyes of jurors over that of other witnesses as [the expert witness] sat in a place usually reserved solely for counsel and the defendant." *People v. Jackson*, 2012 IL App (1st) 100398, ¶ 14.

¶ 115 In the instant case, the prosecutor sat in the witness stand to argue credibility. During the hearing on the posttrial motion, the prosecutor said, "it's okay to walk the line as long as you don't cross that line, as long as you're doing everything ethically and in good faith." We find that by taking the witness stand to argue S.B.'s credibility the prosecutor did cross the line. There is no question that his intent was to silently vouch for S.B. A remark that pledges a prosecutor's personal or professional reputation for the credibility of a witness is improper. *People v. Lark*, 127 Ill. App. 3d 927, 936 (1984); *People v. Bitakis*, 8 Ill. App. 3d 103, 106-07

(1972). In evaluating the claim of prosecutorial misconduct during argument, we are also mindful that "the prosecutor's opinion carries with it the imprimatur of the Government and may induce the jury to trust the Government's judgment rather than its own view of the evidence." *United States v. Young*, 470 U.S. 1, 18-19 (1985).

¶ 116 One of the principal functions of a trial judge is to be in control of the trial. Ill. S. Ct. R. 63(A)(2) (eff. July 1, 2013) (a judge should maintain order and decorum in proceedings before the judge). Some trial lawyers can be magnetic and forceful, using body language, rhetoric, and other tactics to persuade a jury. However, that conduct must comport with acceptable courtroom etiquette. It is the trial court's duty to maintain order in the courtroom. *People v. Dixon*, 36 Ill. App. 3d 247, 253 (1976). The trial judge must take steps to avoid the appearance that he or she is partial to the State or to the defense. Even absent an objection from the defense, the trial court here should not have allowed the prosecutor to argue from the witness stand. "The responsibility for restraining prosecutorial misconduct rests also with the circuit court." *People v. Ray*, 126 Ill. App. 3d 656, 664 (1984). Argument or conduct that is clearly prejudicial should be terminated *sua sponte*.

¶ 117 Our research has located one case involving a prosecutor who took the witness stand to make a closing argument. In *Drayden v. White*, 232 F.3d 704 (9th Cir. 2000), the prosecutor sat in the witness chair and delivered a soliloquy, performing the role of the deceased victim. *Id.* at 711-12. The court concluded that the prosecutor's performance was misconduct. *Id*. at 712. Specifically, the prosecutor "risked improperly inflaming the passion of the jury through his first-person appeal to its sympathies for the victim who, in the words of the prosecutor, was a gentle man who did nothing to deserve his dismal fate." *Id*. at 713. In the instant case, we agree with defendant that by taking the stand to argue S.B.'s credibility the prosecutor improperly

"invoked the integrity of his office, the State's Attorney's office, by commenting about the witness from the witness seat." See *id*.

¶ 118 The State wrapped up its rebuttal with a final appeal to sympathy, calling defendant a "bully" who took advantage of the "weakest amongst us." The State then said, "[b]ut [S.B.] doesn't want your pity or your sympathy, all [S.B.] wants is justice." These remarks were improper, as they served only to inflame the passions of the jury. *People v. Spreitzer*, 123 Ill. 2d 1, 38 (1988) (noting that the State was not free to invite the jurors to enter into some sort of sympathetic identification with the victim).

¶ 119 This is a tragic case. As defense counsel acknowledged, one cannot help but feel sympathy for S.B. However, no matter how sympathetic S.B. might be, and no matter whether defendant might be a cad or a scoundrel, guilty verdicts may not be based on sympathy. During arguments on the posttrial motion, the State argued, "the appellate court has a cold record of black and white words on paper. They don't see the witnesses on the stand. They don't see the emotion that's conveyed that the jury picked up on." Rape victims who brave the criminal justice system deserve fair and strong prosecution efforts based upon the law and available evidence. As both the State and the trial court observed, we review transcripts, words on paper. In our legal system, words and terminology are paramount, not emotion. Whether a lawyer is the prosecutor or defense counsel, he or she has to know how to establish points by questions asked and answers given. In this case, rather than introducing evidence to disprove consent, the prosecutors chose to rely on emotion and argue that S.B.'s answers on cross-examination were not her words but were the product of manipulation. More than 800 pages of trial transcript after S.B.'s testimony did not disprove S.B.'s cross-examination testimony, which established consent. The State summarized this testimony as "having consensual sex in the back seat of the

car; that she was agreeable to all this." The trial court agreed with this assessment, saying that S.B. gave defendant "a great cross-examination." The trial court said, "she testified in greater detail to what the *clear inference was, consensual sexual encounter*." (Emphasis added.) While we are not bound by these observations, we agree that S.B.'s testimony viewed in its entirety was sufficient evidence of consent, which the State never disproved.

¶ 120    As we have said, this is a tragic case. While S.B. subjectively might not have wanted to have sex with defendant, her cross-examination testimony indicated a freely given agreement, expressed in her actions. The State successfully convinced the jury to disregard this evidence. We will not do so. Viewing all of the evidence in the light most favorable to the State, we find the evidence that defendant forced S.B. to engage in intercourse so improbable and unsatisfactory as to create a reasonable doubt of defendant's guilt. Accordingly, we reverse defendant's conviction. For this reason, we need not review defendant's contention that his 12-year sentence was excessive.

¶ 121                             III.  CONCLUSION

¶ 122    In sum, defendant's conviction of aggravated criminal sexual assault is reversed because the State failed to prove force and failed to disprove defendant's defense of consent by S.B. Also, the State committed prosecutorial misconduct in its closing and rebuttal arguments, which severely prejudiced defendant's case. For these reasons, the judgment of the circuit court of Lake County is reversed.

¶ 123    Reversed.

¶ 124    JUSTICE BURKE, specially concurring in part and dissenting in part.

¶ 125    I agree with the majority that the prosecutors injected error into this case during closing arguments. I write separately on this point to distance myself from the majority's statement,

"We are reasonably certain that but for the prosecutors' improper remarks during closing and rebuttal argument the jury's verdict would have been not guilty." *Supra* ¶ 105. The cumulative improper comments potentially contributed to defendant's conviction, which would warrant a reversal. See *People v. Burton*, 2012 IL App (2d) 110769, ¶ 17 (quoting *People v. Wheeler*, 226 Ill. 2d 92, 123 (2007)). However, I am not reasonably certain that the jury's verdict would have been different absent the remarks.

¶ 126 While I agree that this case should be reversed, I part company with the majority in its outright reversal. I believe that there is evidence in the record that supports a remand for a new trial.

¶ 127 The victim testified to the following on direct examination: (1) defendant entered her car uninvited; (2) she ended up in the backseat of her car because defendant "flung [her] legs back into the back seat"; (3) defendant "took his penis and stuck it inside" her; (4) she did not want defendant to do this and told him three times to get off her but he would not; (5) she used her hands in an attempt to get defendant off her; and (6) when defendant finally stopped she saw that his penis was bloody. The victim sustained two separate lacerations to the inside of her vagina, one being four centimeters in length and "fairly deep."

¶ 128 Dr. Holt's testimony corroborated the victim's direct examination. Dr. Holt stated that in 32 years' experience she had never seen this type of injury caused by consensual intercourse. Based on the depth and severity of the tearing, she opined that the injury was caused by a traumatic event.

¶ 129 The victim did testify on cross-examination that, when she said she was uncomfortable, defendant got off and repositioned. When she became uncomfortable again, she "straddled"

defendant and sat on him.  On redirect examination, the following exchange took place concerning when the victim "straddled" defendant:

> "Q.  Mr. Stone asked you and talked to you about straddling the Defendant.  Do you know what that word 'straddle' means?
>
> A.  Yes.
>
> Q.  When [*sic*] does it mean?
>
> A.  It means that my legs were wrapped around him.
>
> Q.  Okay.  And were you on the bottom and seated in the car?
>
> A.  Yes."

¶ 130   This testimony can be viewed as the victim being confused as to whether she was ever on top of defendant.  The State certainly has the burden of proving the elements of its case at trial beyond a reasonable doubt.  At this stage, we look at the totality of the evidence in the light most favorable to the State in determining whether a rational trier of fact could have found the essential elements beyond a reasonable doubt.  *People v. Collins*, 214 Ill. 2d 206, 217 (2005).  The victim never recanted or retracted her testimony concerning force and lack of consent.  The jury was free to weigh the victim's testimony in light of any discrepancies and conflicts, and to accept or reject as much or as little of it as it chose.  See *People v. Goodloe*, 263 Ill. App. 3d 1060, 1069 (1994).  The portion of the victim's cross-examination testimony cited above, while certainly detrimental to the State's case, did not establish consent to the exclusion of the other properly admitted evidence.

¶ 131   As previously stated, Dr. Holt's testimony corroborated the victim's direct examination on the issue of force.  The majority discounts Dr. Holt's opinion because it was based on her experience with "other victims" as opposed to the specific details of this case.  Dr. Holt actually

based her opinion on 32 years' experience, seeing thousands of women a year who had had simple intercourse, treating "probably a few dozen" women whose vaginas had been injured as a result of trauma, and the depth and severity of S.B.'s injury. It is also clear that Dr. Holt was aware of the fact that there was some indication that the victim was sexually assaulted, as Dr. Holt prepared part of the sexual assault kit.

¶ 132 On appeal, defendant does not contest the trial court's ruling allowing Dr. Holt to render opinion testimony in this area, but, like the majority, he complains about its foundation. While the doctor apparently was unaware of the specific details of the assault, this deficiency would go to the weight to be afforded her testimony. The majority discounts Dr. Holt's opinion because it lacks "evidentiary force." *Supra* ¶ 96. The evidentiary force or weight of Dr. Holt's opinion is the province of the jury, not this court of review.

¶ 133 I would hold that, viewing the evidence adduced at defendant's trial in the light most favorable to the State, a rational jury could have found force and lack of consent beyond a reasonable doubt. Therefore, I would remand the case to the circuit court for a new trial.