2025 IL App (1st) 230449
No. 1-23-0449
Opinion filed August 29, 2025

Sixth Division

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 18 CR 06600 01 |
| | ) | |
| JORGE VELAZQUEZ, | ) | The Honorable |
| | ) | Gregory Paul Vasquez, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE HYMAN delivered the judgment of the court, with opinion.
Justices C.A. Walker and Gamrath concurred in the judgment and opinion.

**OPINION**

¶ 1     The trial judge holds considerable power over the courtroom. With this authority comes the obligation to embody fairness, maintain neutrality, and exercise restraint. Jorge Velazquez contends that the judge overseeing his bench trial abandoned each of these obligations. We agree.

¶ 2     Velazquez first argues that the State failed to prove beyond a reasonable doubt that he committed predatory criminal sexual assault of a child. We find that a rational trier of fact could have reasonably concluded that Velazquez was guilty.

¶ 3    Next, Velazquez asserts that the trial judge engaged in judicial misconduct. A thorough review of the record leads us to the conclusion that the judge acted arbitrarily and capriciously, resulting in a fundamentally unfair verdict. Rather than preside from the bench, he sat in the jury box throughout the trial, posed hundreds of questions to the witnesses, and often stood close to them while they testified. More troubling, mid-trial, he suggested that key defense witnesses seemed to be lying.

¶ 4    A conviction may be supported by sufficient evidence and still demand reversal if the trial was not fairly conducted. That is not a contradiction. The law asks two distinct questions: Was there enough evidence to convict, and was the trial officiated with the fairness our system requires? The first speaks to proof; the second, to process. A defendant is entitled to a neutral judge who conducts the proceedings with impartiality, dignity, and respect for the boundaries of judicial authority.

¶ 5    A judge is duty-bound to remain impartial and allow both sides to be heard without disrupting the balance the law requires. Justice is undone when a judge denies the "necessary incident of a fair trial." See *Powell v. Alabama*, 287 U.S. 45, 52 (1932). No conviction, however supported, can undo what the United States and Illinois Constitutions guarantee every criminal defendant: a fair chance to be heard. We reverse and remand for a new trial.

¶ 6                                    BACKGROUND

¶ 7                                    *Bench Trial*

¶ 8    The State accused Jorge Velazquez of committing predatory criminal sexual assault of a child (720 ILCS 5/11-1.40(a)(1) (West 2018)). The State presented the complaining witness and a propensity witness, both of whom were his now-adult nieces. (We will refer to them by their

initials, consistent with custom. *People v. Munoz-Salgado*, 2016 IL App (2d) 140325, ¶ 1 n.1). The defense presented Velazquez and six others, including family members and a friend.

¶ 9    Throughout the bench trial, the judge presided from the jury box. After the trial, he explained that he makes it a "practice to sit in the jury box and watch the witness testify." But he did not stay seated. "I made it a point, rather than sitting on the bench, to look at the witnesses and evaluate their demeanor. I came down off the bench and stood right in front of them, every single witness." During the trial, he did not explain his movements on the record.

¶ 10                                    Testimony of V.S.

¶ 11    V.S. testified that, in 2018, she told the police how her uncle, Velazquez, had sexually assaulted her when she was a child. Velazquez was born in 1971, and V.S. was born in 1995. She described two assaults during the summer of 2002, while Velazquez did mechanical work with her dad in the garage, and a third incident, an attempted assault at a family gathering, about four or five years later.

¶ 12    During the first assault, V.S. stood at the edge of her bed playing with dolls when Velazquez appeared. He pulled down her underwear, raised her skirt, and inserted his finger into her vagina twice. They said nothing to one another. V.S. prayed her father would walk in because he would know what was happening.

¶ 13    During the second assault, weeks later, Velazquez again entered V.S.'s bedroom, pulled down her underwear, and inserted his finger into her vagina once. It caused V.S. pain and upset and terrified her. But she did not understand what happened, did not tell her parents, and did not "show any or symptoms that [she] was in pain at that time."

¶ 14     The third incident occurred during a family party at Velazquez's home when V.S. was age 12 or 13. Velazquez tried pulling V.S. close to him as she walked by in the living room. V.S. resisted. They said nothing to one another. V.S. "pushed back" because she had learned about sexual assault through a school program. She did not tell her parents, feeling that they would not believe her, and worrying that she would no longer be close to Velazquez's sons.

¶ 15     On cross-examination, V.S. agreed when asked by counsel whether this incident was years later, and then also agreed with the trial judge that she was "slightly older" at the time of the third incident.

¶ 16     V.S. testified that she disclosed the third incident to her best friend. Years later, after going on her first date, she disclosed the assaults to her mother, but they did not go to the police, fearing family fallout. Finally, in 2018, V.S.'s mother shared V.S.'s account after hearing that a young family member of Velazquez's and a 20-something cousin (J.C.) had accused Velazquez of assault. Soon after, V.S. spoke with the police on multiple occasions and described three to six instances of penetration.

¶ 17     During V.S.'s direct examination, the trial court posed 14 questions across 14 pages of transcript, some asking V.S. to repeat herself, but most seeking new information. During cross-examination, the trial court asked 88 questions across 28 pages of transcript, primarily seeking responses about the incidents, the disclosures (hers and others), and the family dynamics before the assault accusation.

¶ 18     For example, V.S. continued to attend holidays and gatherings about two to three times a year and never missed one. She remained close with one of Velazquez's sons and wanted his family to live closer to her. She still spoke to Velazquez and politely interacted with him but never

hugged or kissed when greeting him. She or her parents asked him to be a godfather for her *quinceañera*, meaning he had helped fund the party and posed for a photo with him and the family. She acknowledged that, more recently, her husband received money from him.

¶ 19                              Propensity Evidence

¶ 20    J.C. testified that she told the police how her uncle, Velazquez, sexually assaulted her when she was a child, 10 years after the assaults V.S. described. J.C. lived with her family on the second floor of a dwelling in which Velazquez's family lived in the basement and other relatives on the first floor. J.C. testified that Velazquez touched her "inappropriately" "at least five times" and described two assaults in detail. Both occurred in the basement when J.C. was 12 years old.

¶ 21    During the first assault, J.C. was watching S.G., then an infant, while Velazquez's wife showered and Velazquez's sons were in their room. Velazquez arrived, saw J.C. with S.G. in the living room, and touched her vagina while saying nothing. She pushed his hand away. He touched her nipple and squeezed her breast. He stopped when his wife appeared. J.C. excused herself and cried upstairs. She told no one, fearing family fallout.

¶ 22    The second assault occurred while J.C. was doing laundry in the basement. Velazquez appeared and rubbed her vagina over her clothes. He said nothing. J.C. picked up her laundry basket and tried to walk upstairs. Velazquez grabbed the basket, put it to the side, and grabbed her leg. That caused her legs to separate, and Velazquez placed his hand down the front of her shorts and touched her again. J.C. grabbed her basket, ran upstairs, and cried. She told no one, still fearing family fallout. She would continue to hug Velazquez to greet him but would not kiss him.

¶ 23    J.C. testified that she disclosed these incidents to her mother six years later and that S.G., then five, had just accused Velazquez of touching her. S.G. had been crying while getting dressed to go home, and J.C. took S.G. to the basement to speak. Later, J.C. spoke with the police.

¶ 24    During J.C.'s testimony, the trial court asked about 79 questions, primarily seeking substantive responses. Most of those occurred on cross-examination as the court sought responses about the incidents, J.C.'s and S.G.'s disclosures, and the family dynamics preceding the assault accusation. (Cross-examination covered 16 pages.) In short, J.C. had been close to Velazquez and his family but not since 2018 when these accusations arose.

¶ 25    Despite the State's use of S.G.'s statements at trial, the trial court did not hold a hearing under section 115-10.1 of the Code of Criminal Procedure of 1963 (725 ILCS 5/115-10.1(b) (West 2022)) on their reliability.

¶ 26                              Defense

¶ 27    The defense called Velazquez, family members, and a friend of Velazquez's. The trial judge asked about 96 questions of defense witnesses, primarily seeking substantive responses. The judge noted pauses on the record when some witnesses testified but not when he approached them. (Later, when delivering the verdict, the judge described approaching all the witnesses but not the number of times or when.) Velazquez denied V.S.'s and J.C.'s accusations and, like the other defense witnesses, described the family dynamics before the confrontation.

¶ 28    Ivana Rosales grew up with V.S. Her mother is V.S.'s cousin. Rosales recalled going to a theme park with V.S., V.S.'s boyfriend, and others when V.S. was 13 or 14 years old. V.S. and her boyfriend held hands, kissed, and hugged at the park.

¶ 29   Mario Castillo (Castillo) also grew up with V.S. He and V.S. are cousins. He recalled that at family gatherings, either at her grandma's home or V.S.'s home, V.S. would act the same with Velazquez as with others when greeting them, either by hugging them or shaking their hand. But he never saw Velazquez and V.S. hug and kiss. During this testimony, the trial judge put on the record a "significant pause" during Castillo's testimony.

¶ 30   Norma Juarez knew the family for 20 years and was a friend of Velazquez's. Juarez met V.S. at family parties around the time V.S. was six years old. She also met J.C. around that time. Counsel asked Juarez if she recalled how V.S. acted toward Velazquez "after she was *** six years of age," and the State objected, insisting on a more specific time range. The trial court sustained and stated, "The reason the Court is pausing is because the witness is pausing as if—give me the impression obliged to answer." Juarez then recalled V.S. hugging and kissing Velazquez to greet him at a family party as a 12- or 13-year-old.

¶ 31   Ivan Garcia grew up with V.S. and J.C., his cousins. He is a son of Velazquez. Counsel asked Garcia about going to the park as a child with his dad, J.C., and others; the State objected to the relevance. The trial court overruled the objection, stating "[T]he impression is that you're pulling teeth out of the witness and frankly putting words in the [witness'] mouth." Counsel then noted how the timeline of the accusations was open-ended. The trial court replied in part, "I let everything in and I sift through it [at a bench trial]." The court noted it disliked the pace of counsel's questioning, "When it's coming out in a constrained fashion where the witnesses are silent for a long period of time, and they're looking over at the defendant or someone at the defense counsel table as if they want to get answers[.]"

¶ 32    Garcia testified that, throughout childhood summers, Velazquez would take him, J.C., and their respective siblings to the park several times a week. He recalled that J.C. would tease, hug, kiss, and pinch Velazquez at family parties. He also recalled how Velazquez would drive him and J.C. home from shifts at a restaurant job they held after Garcia graduated from high school.

¶ 33    Ana Martinez, a friend of Velazquez's wife, was expected to testify that S.G. denied the accusations that Velazquez assaulted her. But the State objected to the relevance of Martinez's testimony, and the trial court sustained the objection, labeling the notion that her testimony could be used to impeach J.C.'s account of confronting S.G. as "extremely disingenuous."

¶ 34    Laura Castillo (Laura), Velazquez's wife, testified that V.S. approached them when she was 14 years old to be her godparents ("*padrinos*," a designation under the Catholic faith which commits them to raise V.S. if her parents passed away). Laura further testified that V.S. asked them for a $1,500 loan in 2017, which they provided and she never repaid.

¶ 35    When counsel inquired whether V.S.'s mother had hired a babysitter around the time of the assaults described by V.S., the State objected. The judge overruled the objection, stating, "I'm going to allow it in. But not if it's going to take so long. The pauses between questions is [*sic*] killing me because of the time span. It's appearing as though something is being contrived as we speak. So I'm trying to avoid that." Laura answered by stating that V.S. had a babysitter (her brother's wife) living in the basement.

¶ 36    Laura also testified that she never asked J.C. to babysit S.G. and that Velazquez was S.G.'s primary caretaker when S.G. was an infant.

¶ 37    Laura agreed that, since the confrontation in 2018, the family's relations had fractured. She does not allow S.G. to speak with J.C., and she no longer speaks with V.S., J.C., or her sisters.

¶ 38    Velazquez denied the accusations against him. Regarding V.S., he denied touching in a sexual manner, entering her room, and using her family's bathroom while working with V.S.'s father. (He testified they would use a bucket to urinate while working on cars in the garage and that he would only go inside with V.S.'s father.) Velazquez recalled V.S. being at home with her babysitter during those summer days. At family parties and in his house, V.S. would greet him with a kiss and a hug, which he accepted, although he was not accustomed to these gestures. V.S. would play with Velazquez's children. As a teenager, she asked him and his wife to be her godparents, and as an adult, she asked them for a loan, which they provided.

¶ 39    As for J.C., Velazquez denied touching her sexually and denied that he ever saw her babysitting S.G. while his wife showered. He described J.C. as a playful and affectionate child who sometimes hugged and kissed him.

¶ 40                                    Verdict

¶ 41    In closing, the parties focused on witness credibility. The State noted how upset J.C. was while testifying, stressing that the trial court "saw" her "trembling" and weeping on the stand.

¶ 42    The trial court found Velazquez guilty of predatory criminal sexual assault of V.S., stressing its "opportunity to evaluate the credibility of the witnesses."

> "I have heard the girls [V.S. and J.C.] testify. And, frankly, I believe them. It was certainly clear from their demeanor, their demeanor on in some instances was getting upset, which is understandable. But they still get upset years later, which some people would say is very consistent with this type of assault.
>
> I made it a point rather than sitting on the bench to look at the witnesses and evaluate their demeanor. I came down off the bench and stood right in front of them, every

single witness. Including the defendant who sat in and [*sic*] jury box at times. I stood right in front of each witness at times. When there was a long pause—which I never noted for the record, I began to question the witness as almost to imply that there was an invitation for somebody to ask something.

In short, I found no motive for these witnesses, State witnesses, to testify falsely.

The defendant did testify. And when the defendant does testify, he places his credibility in issue.

I have determined from viewing his testimony that defendant is not credible, nor were many of his witnesses."

¶ 43                                        *Posttrial*

¶ 44     Velazquez moved for a new trial, arguing in part that the trial court erred by questioning the defense witnesses in a manner that "intimidated"—"by leaving the bench and standing [three] to [four] feet in front of [them]." He called Castillo, Juarez, and Laura to testify.

¶ 45     Castillo testified that the trial court came within "a couple feet" of him as he testified. A paned glass, installed as a Covid protocol, separated them. Castillo stated, "I don't know if he was trying to intimidate me for something, but he was really close as [counsel was] asking questions. I felt a little bit intimidated." Castillo noted that the trial court had not presided from the bench throughout the trial.

¶ 46     Without objection, the trial court inquired of Castillo. During that inquiry, the court directed Castillo to look at counsel's face and answer whether he could see the judge's face while he (presumably) sat on the bench. Castillo said he could not see the judge's face. The trial court then asked, "Sometimes I got off the jury box when you were talking softly, right?" Castillo began

to respond, saying, "Most of the time when I was being asked a question, you were right in front of me - -." The court interjected, "Did it change your testimony? True or false?" Castillo replied, "That did not change my testimony."

¶ 47 The trial court began to inquire of counsel while Castillo remained on the stand. The court asked, "[Counsel,] [s]o you want to establish for the record that I was in front of him, yes?" Counsel agreed. When counsel also confirmed that the court could better see and hear Castillo from wherever it chose to sit or stand during trial, the court stated, "So you have established that." The court then directed counsel to call the next witness.

¶ 48 Juarez recalled that the trial judge initially sat in the jury box and moved closer during her testimony. This "intimidated" her because she "thought that he *** was going to think [she] was lying." After counsel finished questioning her, the trial court asked whether she could see his face while looking at counsel. She replied, "No," agreeing that either the trial court would have had to ask her to face him, or he would have to leave the bench if he was to see her face while she testified. She agreed that she thought the court got in the jury box to determine her credibility. When the court asked if that is why she became nervous, she testified, "When you got close to me, yes."

¶ 49 Laura recalled feeling "nervous" because the judge sat in the jury box as she testified. The judge asked her no questions.

¶ 50 The trial court found that no witness testified to having "said something different" because of his actions, only that they were "nervous" which "would never be a basis for a *** new trial." The trial court also faulted the "architectural style" of the courtroom for having to preside off the bench during trial. He suggested that he typically presided this way.

"So it's my practice, especially whether the case hinges, especially when the case hinges on credibility; it's my practice to sit in the jury box and watch the witness testify.

And if I'm having trouble hearing the witness, I'll get up close enough to hear every single word the witness testifies to. I do not want any word to escape my examination.

If I didn't understand something the witness said, I'll make sure that I clarify in a bench trial setting where I am the one who has to determine credibility.

I did realize early on this that was a case that involved the determination of credibility. And so, I particularly made that decision that I should, at least, have the vantage point that a juror would have. So I—that is why I placed myself in a position that I did.

Not one witness got up here and testified that oh, I was so intimidated, I said something different.

So the important testimony leaves something to be desired. But in any event, that's why that was done."

¶ 51 The trial court denied a new trial and later sentenced Velazquez to six years in prison.

¶ 52                                    ANALYSIS

¶ 53 Velazquez contends (i) the State failed to prove beyond a reasonable doubt that he sexually assaulted V.S. and (ii) the trial court engaged in judicial misconduct on several grounds.

¶ 54                          *Sufficiency of the Evidence*

¶ 55 Velazquez argues the State failed to prove his guilt beyond a reasonable doubt because no rational trier of fact could conclude that he sexually assaulted V.S. when she was seven years old. We disagree.

¶ 56    Someone who is 17 years or older commits predatory criminal sexual assault by sexually penetrating someone who is less than 13 years old. *E.g.*, 720 ILCS 5/11-1.40(a)(1) (West 2018) (defining charged offense of predatory criminal sexual assault). We assess the proof in the light most favorable to the State and ask whether a rational trier of fact could have found the elements beyond a reasonable doubt. *People v. Collins*, 106 Ill. 2d 237, 262 (1985).

¶ 57    The parties agreed Velazquez was older than 17 during the relevant time. And V.S.'s testimony tracked the statute's elements. V.S. described how, on two days, Velazquez inserted his finger into her vagina when she was around seven years old, after leaving the garage where Velazquez was working with her father and finding her alone in her room. Velazquez contends V.S.'s testimony was "extreme[ly] vague[ ]." We disagree. Her testimony established the how (finger to vagina), when (summertime, age seven), who (Velazquez), and where (in her childhood room) of the charged offense, not once but twice.

¶ 58    A rational trier of fact could have concluded that Velazquez, a trusted family member in a position of authority over V.S., sexually assaulted her. *People v. Duplessis*, 248 Ill. App. 3d 195, 199-200 (1993) ("In sexual assault cases involving family relationships, the victim's credibility is not lessened if there is no immediate outcry."). The State had no special burden to present bystander accounts, physical evidence, or other corroboration, as Velazquez appears to demand. *People v. Gray*, 2017 IL 120958, ¶ 36 ("The testimony of a single witness is sufficient to convict if the testimony is positive and credible, even where it is contradicted by the defendant."). And V.S.'s testimony need not be free from inconsistency, as if preserved in amber from the sweep of time and its effect on memory. *Gray*, 2017 IL 120958, ¶ 47 ("[E]ven

- 13 -

contradictory testimony does not necessarily destroy the credibility of a witness, and it is the task of the trier of fact to determine when, if at all, she testified truthfully.").

¶ 59    V.S. consistently described at least three acts of sexual penetration, and drawing reasonable inferences in the State's favor, we find no inconsistency that renders V.S.'s account incredible or improbable. See *id.* ("Minor discrepancies in testimony affect only its weight and will not render it unworthy of belief."). That one witness testified to the presence of a babysitter does not preclude a finding that Velazquez's assaults happened while that babysitter was absent. And that V.S. remained close with her cousins, especially Velazquez's sons, does not preclude finding that Velazquez assaulted her. On the contrary, the significance of those friendships is a basis for rationally inferring why V.S. might have remained quiet about what happened. *Duplessis*, 248 Ill. App. 3d at 199-200 (recognizing unique dynamic of familial relationships as rational basis for delaying outcry).

¶ 60    So, too, does her inexperience at seven years old. See generally *People v. Bowen*, 183 Ill. 2d 103, 115 (1998) (noting, "the very young, often lack the cognitive or language skills to effectively communicate instances of abuse at trial *** or may be impeded psychologically in their efforts to do so"). V.S. testified that, during the first and second assaults, she did not understand what Velazquez was doing. Only years later, after a school program, did she realize what he was attempting during the third incident and tell her best friend. Given her age at that time, V.S.'s recollection echoed J.C.'s testimony about Velazquez assaulting her around that age. See generally *People v. Smart*, 2025 IL 130127, ¶ 72 (discussing permissibility of propensity inferences in this context).

¶ 61    To be sure, Velazquez fairly attacks V.S.'s credibility, for example, by pointing to testimony, including his own, that V.S. remained affectionate with him at family parties, as he became her padrino at her quinceañera, and giving her and her husband a loan. Likewise, Velazquez stresses how witnesses described J.C. as affectionate toward Velazquez while playing at the park, attending events with the Velazquez family, and hitching a ride home from work after shifts with his son. But none of this reaches the high bar of "compel[ling] the conclusion that no reasonable person could accept [Velazquez's guilt] beyond a reasonable doubt." *People v. Cunningham*, 212 Ill. 2d 274, 280 (2004). The nature of the crime, V.S.'s young age, and her family's dynamics undermine the idea, explicit in Velazquez's argument, that V.S. (or J.C.) should have "overtly despise[d]" her uncle or that she (or J.C.) had an "unusually affectionate relationship" with Velazquez despite his sexual abuse.

¶ 62    We reject any suggestion that victims of family sexual abuse react, or avoid reacting, in a particular way. That witnesses described V.S. showing physical affection to boys in her teenage years does not preclude a finding that physical affection during her first date led her to disclose to her mother what happened when she was a child. See *In re M.G.*, 2024 IL App (1st) 232106, ¶ 29 (recognizing fear, shame, and guilt as motives to remain silent about sexual abuse within families).

¶ 63    Our task is narrow. See *Collins*, 106 Ill. 2d at 261-62 (stating standard). We hold that the trial record contains sufficient evidence that, when viewed in a light most favorable to the State, rationally supports the finding that V.S. was credible and, thus, Velazquez guilty.

¶ 64                                  *Judicial Misconduct*

¶ 65    Velazquez contends that the trial judge dominated the witnesses and proceedings to render the verdict fundamentally unfair. We agree.

¶ 66 A fair trial is fundamental to every criminal prosecution. *People v. Williams*, 124 Ill. 2d 300, 308 (1988). To that end, the United States and the Illinois Constitution guarantee due process and equal justice under the law. See U.S. Const., amend. XIV; Ill. Const. 1970, art. I, § 2. Due process is a guarantee that the trial court will " 'hold the balance nice, clear and true between the State and the accused.' " *Williams*, 124 Ill. 2d at 308 (quoting *Tumey v. Ohio*, 273 U.S. 510, 532 (1927)). Likewise, equal justice guarantees a trial consistent with the rules of evidence and procedure and free of bias in an open pursuit of the truth. See *id.*

¶ 67 Our constitutional design entrusts the trial court to preside with restraint, consistent with these foundational constraints. *Id.* The parties' dispute centers on the way the judge exercised this discretion, including its extensive questioning of witnesses and its findings of fact. A trial court that acts without the restraint required of it abuses its discretion and must be reversed. See *People v. Holland*, 2023 IL App (4th) 220384, ¶¶ 42-44 (discussing standard of review).

¶ 68 Before reaching the merits, however, we consider and reject the State's contention that Velazquez forfeited review of this issue by not objecting at trial. The State acknowledges that judicial misconduct is a proper basis for relaxing the appellate rule that a defendant must both object at trial and include his objections in a posttrial motion. See generally *People v. Sprinkle*, 27 Ill. 2d 398, 401 (1963) (creating relevant exception to forfeiture rule). No duty to object exists if that objection " 'would have fallen on deaf ears.' " *People v. McLaurin*, 235 Ill. 2d 478, 488 (2009) (quoting *People v. Davis*, 378 Ill. App. 3d 1, 10 (2007)).

¶ 69 The record gives no hint that the trial court would have behaved differently in response to an objection. The judge described as his "practice" presiding from the jury box and physically approaching witnesses as they answered questions. He often commandeered the questioning, both

- 16 -

during trial and after, even cutting short Castillo's posttrial testimony. He described witness demeanor as critical to the finding of guilt but "never *** a basis" for a new trial. In short, the judge created "extraordinary circumstances" calling for us to relax the ordinary rules of forfeiture. See *McLaurin*, 235 Ill. 2d at 488.

¶ 70     Velazquez contends the trial court abused its discretion by (i) impeding counsel's examination of witnesses, (ii) abandoning its role as a neutral arbiter, and (iii) failing to consider its own intimidating behavior when relying on witness demeanor to find guilt. The State responds that the court (i) probed for the truth, rather than provoke responses, (ii) clarified disputed issues, rather than confront witnesses, and (iii) reached a verdict after a full and fair consideration of the evidence. We carefully reviewed the record and reject the State's characterizations.

¶ 71     We begin by noting that, like us, neither party has found a case where the trial court has described as its "practice" presiding from the jury box or a judge approaching testifying witnesses like an attorney. While the trial court enjoys broad discretion to preside as circumstances require and the law permits (see *Williams*, 124 Ill. 2d at 308), the trial court abused that discretion by conducting the entire trial from the jury box, and well alongside the parties, and by blurring the line between neutral arbiter and engaged participant.

¶ 72     Even conduct not barred by a specific rule may be improper. See Ill. S. Ct. R. 63, Canon 3 (eff. Dec. 3, 2005). (stating, in canon then in effect, that judge "should be patient, dignified, and courteous to litigants, jurors, witnesses, [and] lawyers ***."). The layout of the courtroom is intentional, separating the decision-maker from the advocates, and symbolic, reinforcing the solemn divide between the adversarial process and the judge's role as adjudicator. See, *e.g.*, *People v. Mpulamasaka*, 2016 IL App (2d) 130703, ¶¶ 113-118 (error for prosecutor to sit in witness stand

while arguing to jury complainant was credible, even absent defense objection). The prosecution (or plaintiff) and the defense are equally positioned from the bench, allowing both sides to observe the judge readily. The trial judge must re-enforce that balance by "tak[ing] steps to avoid the appearance that he or she is partial to the [prosecution] or to the defense." *Mpulamasaka*, 2016 IL App (2d) 130703, ¶ 116 (error for trial judge to allow State to argue from witness stand).

¶ 73    Both parties acknowledge the extraordinary number of questions the judge asked witnesses during the lawyers' examinations. See generally *People v. Cofield*, 9 Ill. App. 3d 1048, 1050, (1973) (trial court has power to "question witnesses in order to elicit truth or bring enlightenment on material issues which seem obscure"). By our count, the court asked 277 questions of which 217 sought information and 60 asked witnesses to repeat themselves. 200 of the 277 questions (72%) occurred during Velazquez's counsel's examination of witnesses.

¶ 74    But the State also gives short shrift to the judge's cascade of questions consistently coming from a few feet in front of the witnesses in the area reserved for counsel, a departure as unthinkable as a lawyer taking the bench to examine witnesses. And the State contends the volume of questions is less significant than their nature, asserting that the trial court's questioning was not "coupled with hostile remarks" and did not "indicate its opinion of the witnesses' testimony." See *Cofield*, 9 Ill. App. 3d at 1050 (finding error at bench trial where court assumed role of judge and prosecutor). Sometimes that may be true, but here the record refutes the State's portrayal that the court withheld judgment. Amid the trial, the judge repeatedly disparaged the defense witnesses, for example, at one point describing them as "looking over at the defendant or someone at the defense counsel table as if they want to get answers."

¶ 75   The trial court likewise focused on specific witnesses. During Juarez's testimony, the court said he was "pausing" in response Juarez's apparent need for a cue from counsel about what she was "obliged" to say. During Garcia's testimony, the court said to the defense counsel, "[T]he impression is that you're pulling teeth out of the witness and frankly putting words in the [witness's] mouth[.]" During Laura's testimony, the court said, "The pauses between questions is [*sic*] killing me because of the time span. It's appearing as though something is being contrived as we speak. So I'm trying to avoid that." See *People v. Jackson*, 409 Ill. App. 3d 631, 649 (2011) (error at bench trial for court to question witness in way suggesting it prejudged outcome before hearing all evidence). Contrary to the State's view, the judge made statements during trial that expressed derogatory opinions about witness testimony.

¶ 76   The trial court's opinions did not change when it reached (and later affirmed) its verdict, which troubles us for several reasons. First, the trial court inquired about S.G.'s out-of-court accusations (as V.S. and J.C. recounted them) but had never held a hearing under section 115-10.1(b) (725 ILCS 5/115-10.1(b) (West 2022)) on their reliability. See *People v. Mitchell*, 155 Ill. 2d 344, 355 (1993) (error to consider child's out-of-court statements at trial absent reliability hearing). Generally, we presume the trial court only considered admissible evidence. *Smart*, 2025 IL 130127, ¶ 94. But here, the trial court elicited substantive responses about these statements. Further, the trial court curtailed counsel's attempt to impeach those untested statements not based on inadmissibility but on the court's belief that the use of that witness's testimony would be "extremely disingenuous."

¶ 77   Second, the trial court's questioning ticked up dramatically as counsel for Velazquez inquired of witnesses, giving the impression that court was advocating for the prosecution. The

trial court must take steps to avoid the appearance that it is partial to one side. *E.g.*, *Mpulamasaka*, 2016 IL App (2d) 130703, ¶ 116 (error for trial judge to allow State to argue from witness stand in closing to jury). Here, the trial court asked 217 questions seeking information and 60 asked witnesses to repeat themselves, and most of those questions (200 of the 277), occurred while counsel for Velazquez examined witnesses. See *People v. Santucci*, 24 Ill. 2d 93, 99 (1962) (holding "persistent interrogation" of witnesses by the court and comments toward defense counsel "fatally infected" fairness of jury trial).

¶ 78 Third, by basing its credibility determinations on witness demeanor, the trial judge arbitrarily disregarded the impact of its actions. Generally, "[w]hen assessing credibility, a trial court is called upon to evaluate everything together—visual (demeanor, body language), audio (tone), and the effect of the witness's testimony (*i.e.*, the impact a witness's testimony has upon the listeners)." *People v. Carter*, 2021 IL App (4th) 180581, ¶ 70 (describing concept of "paralanguage"). The trial court's findings indicate that it relied on the "demeanor" of State witnesses as credible, "I have heard the girls [V.S. and J.C.] testify. And, frankly, I believe them. It was certainly clear from their demeanor." And he found the demeanor of defense witnesses as not credible, "I have determined from viewing his testimony that defendant is not credible, nor were many of his witnesses."

¶ 79 Yet when denying the motion for a new trial, the judge stated, "I have *** [l]istened to the [defense] witnesses; however, with respect to the witnesses, they nearly [*sic*] said they were nervous, which would never be a basis for a motion for new trial." That is, the trial court found that mere fact that he made the defense witnesses nervous would never be the basis for a new trial, despite basing his verdict primarily on witness demeanor.

¶ 80    By treating demeanor in two different ways, the trial court upsets " 'the balance nice, clear and true between the State and the accused.' " *Williams*, 124 Ill. 2d at 308 (quoting *Tumey*, 273 U.S. at 532). The trial judge admitted that witness demeanor played a deciding role in reaching his verdict, yet he arbitrarily excluded demeanor as irrelevant when denying the motion for a new trial. See *People v. Wofford*, 156 Ill. App. 3d 238, 243 (1987) ("A judge's remarks must be a material factor in defendant's conviction or the prejudice to defendant must appear as their probable result."). We reject the State's contention that this was not error.

¶ 81    The totality of the trial judge's conduct thus reflects that due process and fairness were neither maintained nor meaningfully protected, creating reversible error. The trial court elicited inadmissible evidence (*Mitchell*, 155 Ill. 2d at 355), tilted its questioning in the prosecution's favor (*Jackson*, 409 Ill. App. 3d at 649), derided the defense and its witnesses (*Cofield*, 9 Ill. App. 3d at 1050), and excluded the effect of its actions on the credibility determinations it made (*Williams*, 124 Ill. 2d at 308). The cumulative effect of the judge's words, questioning, and conduct resulted in a denial of a fair trial, leaving us with no choice but to reverse.

¶ 82    We have no concern that these same errors will occur on remand. While this specific trial judge's "practice" compounded these errors, the judge has since retired. See , Ill. State Bar Ass'n Section Newsletter, Recent Appointments and Retirements, https://www.isba.org/sections/bench/newsletter/2023/08/recentappointmentsandretirements (last visited Aug. 20, 2025) [https://perma.cc/67PR-UVUF] (noting Judge Gregory Paul Vazquez's retirement).

¶ 83    Although we can imagine moments when a trial judge may need to move from the bench, we encourage judges to oversee bench trials from the bench. And if they must move, judges should

narrate for the record when they are doing so and why. An open pursuit for the truth requires it. See *Williams*, 124 Ill. 2d at 308. Courtroom etiquette reflects a shared set of norms, which benefits litigants, witnesses, and judges. See Ill. Code Jud. Conduct (2023), Canon 2, R. 2.8(B) (eff. May 17, 2023) (stating, in canon now in effect, judge "shall be patient, dignified, and courteous to litigants, jurors, witnesses, [and] lawyers ***.").

¶ 84 Reversed and remanded for a new trial.

---

*People v. Velazquez*, 2025 IL App (1st) 230449

---

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 18-CR-06600(01); the Hon. Gregory Paul Vasquez, Judge, presiding. |
| **Attorneys for Appellant:** | James E. Chadd, Douglas R. Hoff, and Timothy Liam Kelly, of State Appellate Defender's Office, of Chicago, for appellant. |
| **Attorneys for Appellee:** | Eileen O'Neill Burke, State's Attorney, of Chicago (John E. Nowak, Daniel Piwowarczyk, and Mary R. Hain, Assistant State's Attorneys, of counsel), for the People. |